MILLARD H. HALL AND METTIE BURMA HALL, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1942–66, 1528–67.   Filed April 30, 1968.

*Claude R. Wilson*, for the petitioners.
*Harold L. Cook*, for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in petitioners' income tax for the years 1963 and 1964 in the amounts of $10,906.50 and $12,683.27, respectively.

The issues for decision are:

(1) Whether the cost to one of petitioners of acquiring a management contract with a mutual assessment life insurance company is subject to depreciation or amortization and, if so, the period over which it may be amortized, and

(2) Whether respondent made a second inspection of petitioners' books for the year 1963 and, if so, does that fact cause his determination of deficiency for that year to be invalid.

#### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners, husband and wife, resided at the time of filing the petitions herein, in Dallas, Tex. They filed their joint Federal income tax returns for the calendar years 1963 and 1964 with the district director of internal revenue at Dallas using the cash receipts and disbursements method of reporting income.

Millard H. Hall (hereinafter referred to as petitioner) has been in the insurance business since 1930. Since 1943 or 1944 he has worked for Bankers Life and Loan Co. (hereinafter referred to as Bankers Life), a statewide mutual assessment life, health, and accident insurance company, organized and existing under the laws of the State of Texas and subject to the rules and regulations of the State Board of Insurance of the State of Texas.

Bankers Life (formerly known as Bankers Life and Loan Association) is the successor of Aviators Benevolent Association, which was

chartered in Texas on June 21, 1929, for a stated term of existence of 50 years, with the right to renew and extend the charter vested in the board of directors. The State of Texas has not chartered any mutual assessment insurance companies for over 20 years and the number of such charters outstanding has decreased during the years no new charters have been granted. There are about 30 statewide mutual assessment insurance companies now in existence in Texas. However, under the present laws of Texas and policies of the State Board of Insurance the charter of Bankers Life will be renewed if such renewal is sought by the directors.

A mutual assessment insurance company is a nonprofit organization. Its members are the policyholders. The policyholders elect the board of directors which board is charged with the general supervision of the company. The constitution and bylaws of Bankers Life provide that the members may vote by proxy and that "Said proxy may designate the President or Secretary * * * as proxy." Petitioner has been president of Bankers Life at least since 1963. The directors elect officers of the company and also select a manager of the company who directly manages the operations of the company. The manager may employ general agents for the sale of insurance.

A mutual assessment insurance company divides its premium payments received into two funds, a mortuary fund and a general expense fund. Bankers Life operated during the years in issue under "Plan III," of the plans of premium division approved by the State Board of Insurance of the State of Texas. This plan requires that 60 percent of premium income be put into the mortuary fund and that 40 percent may be put into the general fund, except that 100 percent of first-year premiums may be put into the general fund. All claims, except first-year claims, are paid from the mortuary fund. All expenses and first-year claims are paid from the expense fund. The policyholders may, with the approval of the State Board of Insurance, be assessed to meet claims if the mortuary fund is insufficient.

Petitioner entered into a general agency contract with D. C. Tabor and Bankers Life on August 14, 1945. D. C. Tabor was then president of Bankers Life and had a management contract with Bankers Life. Petitioner received the exclusive right to sell certain specified insurance policies and to hire and supervise agents for that purpose. The policies which petitioner was entitled to sell were listed by identifying numbers in the agency contract, but were not otherwise described. Petitioner agreed to maintain an office and equipment for the business of selling the specified policies of insurance for Bankers Life and to bear all expenses of such sales including agents' commissions. This contract provided in part with respect to commissions payable to petitioner:

On all policies sold on either the annual, quarterly or monthly plan, through the Agency, Second Party [petitioner] shall be entitled to and shall receive Fifty

(50%) per cent of that portion of premium or premiums not required by law to be put into the Mortuary Fund of First Party (2).

The contract also contains a provision that in the event insurance was withdrawn by Bankers Life from the market "such shall not in any wise effect the amount or amounts due Second Party [petitioner] on renewals of outstanding policies." The last two paragraphs of this contract provided:

### XVII.

It is agreed and understood that this contract is not an exclusive right for all life, health and accident and hospitalization policies but pertains to the aforementioned policies only, or, policies that are mutually agreed on by First Party (1) and Second Party.

### XVIII.

It is further agreed by the parties hereto that this contract shall in nowise transfer or encumber the Charter of the Bankers Life & Loan Company, or any interest therein.

Bankers Life entered into a management contract with D. E. Tabor on October 14, 1947. The contract contained the following provisions:

(1) It is hereby agreed by and between all parties hereto that the said D. E. Tabor shall be the sole managing head and director of all the affairs of the Bankers Life & Loan Company for a period of years equal to the life of the Charter of the said Bankers Life & Loan Company. That the compensation for the said management of the said Company shall be all monies directed to the Expense Fund under the laws and regulations of the Department of Insurance of Texas.

(2) It is further agreed that out of the said monies so collected by said Company and turned over to the said D. E. Tabor as his compensation, that the said D. E. Tabor is to pay all operating expenses of the said Company, such as office rent, typists, stenographers, printing material, telephones, telephone bills and all other incidental bills and expenses in connection with said Company.

On February 7, 1950, an agreement was entered into "between Mrs. D. C. Tabor, Bankers Life & Loan Company" and petitioner which provided in part:

The BANKERS LIFE & LOAN COMPANY, herein referred to as Company, is a mutual assessment company licensed under Articles 4879-f and 5068-1, Revised Statutes of the State of Texas. MRS. D. C. TABOR, a widow, herein called TABOR, is President of said Company and has a General Agency or Manager's Contract with the Company which is referred to and made a part hereof. M. H. HALL, herein referred to as HALL, is an experienced insurance man and now has a General Agency Contract, dated August 14, 1945, with Tabor and the Company for the writing of specified types of insurance contracts, which said contract is here referred to for a description of the type of insurance included therein and excluded from this contract. Under the law and Insurance Regulations applicable to the Company, a certain portion of the premiums received by the Company are required to be placed in a Mortuary Fund, and the balance, herein referred to as the General Expense Fund, is allowed for expenses. This General Expense Fund differs from the first year's premium, according to the plans permitted by the Insurance Department to be selected by the Company. Thereafter, the amount of renewal premiums required to be placed in the

Mortuary Fund is 60%, leaving 40% for expenses. Under Hall's Agency Contract, above referred to, he is entitled to a portion of the Expense Fund on policies written under the terms of said Agency Contract. All other General Expense Funds belong to Tabor and are herein referred to as Tabor's General Expense Fund. In the event of a change in the law, or regulations applicable, the General Expense Fund as herein used, shall be deemed to be that portion of the total premiums, which, under any applicable law, may be used for the payment of expenses. Renewal premiums as herein referred to, means all premiums received on any policy subsequent to the first policy year.

TABOR and the COMPANY on the one hand, and HALL, on the other, have this day entered into the following contract and agreement, to wit:

1. Tabor and the Company hereby employ Hall, and Hall hereby agrees to act, as Manager of the Company's business, including office management, the production of business, the inspection and underwriting of risks, the adjustment and settlement of claims, and the furnishing of all services necessary in the conduct of the business of the Company, except such as Hall is now obligated to perform under his Agency Contract aforesaid, and except such as must be personally performed by officers of the Company, and Tabor as the managing head and director of the affairs of the Company.

2. This agreement, with respect to Hall's Compensation and the expenses the parties shall respectively bear, is divided into two parts: (A) With respect to the balance of the calendar year 1950, and (B) With respect to subsequent years:

 *   *    *    *    *    *    *

(B) *With respect to subsequent years:*

(1) Beginning January 1, 1951, Hall agrees to perform all of the services enumerated in Paragraph 1, and 2(A) (2) above, and to pay all expenses of every nature incident to the conduct of the Company's business, including all Home Office Expense, such as, but not limited to, office rental, equipment and furnishings, all necessary stationery, literature, postage, supplies of every nature whatsoever, all taxes of every nature, fees of examination by the Insurance Department, cost of all statutory bonds required, etc.

(2) Beginning January 1, 1951, Hall shall be entitled to receive for all services to be rendered by him, and all expenses to be incurred in that connection, the amount remaining of Tabor's General Expense money after:

(a) Paying to Tabor the first $1000.00 per month thereof, beginning February 1, 1951, and continuing thereafter on the first day of each month during the life of this contract;

(b) Paying to Tabor an amount equal to 3% of the gross annual renewal premiums received from all business of the Company in excess of $150,000.00 and not in excess of $200,000.00, and 5% of the gross annual renewal premiums in excess of $200,000.00. The amounts payable under this Subdivision (b) shall be paid as soon as the amount payable can be determined.

 *   *    *    *    *    *    *

6. This contract may be terminated by Tabor or the Company, at any time after February 1, 1951, in the event the $1000.00 per month, herein agreed to be paid, is not paid to her within ten (10) days after the expiration of the month for which same is due, or for failure upon the part of Hall to faithfully perform the duties herein agreed to be performed in accordance with the statutes, regulations and rules of the Insurance Department applicable to said Company. In the event of such termination, Hall shall, nevertheless, be entitled to renewal commissions equal to one-half the expense portion of premiums on all insurance produced by him under the provision of this contract.

If Hall quits the employment under this contract, or accepts employment in any capacity with another insurance company, he shall forfeit all rights to compensation under the provisions of this contract; but his right under his Agency Contract of August 14, 1945, shall be governed solely by the provisions thereof.

7. This contract in nowise encumbers the Charter of the Company, impairs Tabor's rights in respect thereto, or gives Hall any proprietory interest of any nature in the Company, its Charter or assets. Hall shall do nothing to interfer [sic] with Tabor's succession in office as President of the Company, and any and all proxies mailed out by Hall or his assistants shall run in favor of Tabor or her nominees, and no other person. Hall's rights under the existing Agency Contract hereinabove referred to shall not be affected hereby.

8. This Contract is personal to Hall, shall not be assigned by him, and shall terminate at his death. If it is terminated by Hall's death, his representatives shall be entitled to renewal commissions equal to one-half the expense portion of premiums on all insurance produced by him under the provisions of this Contract. This contract shall be binding upon, and inure to the benefit of, the parties, their heirs and legal representatives, and the successors and assigns of Tabor and the Company.

On June 30, 1959, petitioner purchased the management contract. The agreement provided:

That MRS. D. C. TABOR, herein called Tabor, agrees to sell and M. H. HALL, herein called HALL, agrees to purchase Tabor's Management Contract dated October 14, 1947 with BANKERS LIFE & LOAN COMPANY, a state-wide mutual life insurance company, for the price and on the terms and conditions following, to-wit:

1. The price shall be $180,000, payable $5,000.00 cash, and the balance by one promissory note for the sum of $175,000.00, payable at the rate of $1,500.00 per month for 116 months and a final monthly installment of $1,000.00, with interest payable monthly on the unpaid balances at the rate of 2% per annum, the first installment being due and payable on August 1, 1959, and a like installment on the first day of each and every month thereafter until the full amount of principal and interest is paid.

\* \* \* \* \* \* \*

3. Hall covenants and agrees that he will not within three (3) years from the effective date of completion of the sale, transfer or surrender said Management Contract to Bankers Life & Loan Company for cancellation, except as such cancellation may be a necessary step in the substitution of Hall for Tabor as Manager of the Company.

\* \* \* \* \* \* \*

5. It is the intention of the parties that neither this agreement nor any instrument executed in performance hereof shall effect or be construed to effect any change in or invalidation of the said Hall's general agency contract dated August 14, 1945, except as heretofore amended by agreements in writing by the parties thereto.

On June 30, 1959, petitioner executed a promissory note for $175,000 payable to Tabor in 116 monthly installments bearing 2-percent interest on the unpaid balance and Tabor assigned the management contract to petitioner by a document reading as follows:

That Mrs. D. C. Tabor, for and in consideration of the sum of Ten and No/100— ($10.00)—Dollars and other valuable consideration, the receipt of all of which is hereby acknowledged, has this day transferred and assigned, and does hereby transfer and assign to M. H. Hall that certain Management Contract between her and Bankers Life & Loan Company dated October 14, 1947, together with all rights, title and interest which she has by reason thereof, together with all rights, title and interest she has in and to the Charter of the said Bankers Life & Loan Company and everything pertaining to said Bankers Life & Loan Company now owned by her.

Rule VIII of the rules governing statewide mutual assessment companies adopted by the State Board of Insurance of the State of Texas on November 19, 1960, provides in part as follows:

A. The Board finds and declares that Mutual Assessment Companies, Local Mutual Aid Associations and Burial Associations shall operate in the following manner and under the following conditions:

    \*      \*      \*      \*      \*      \*      \*

3. The Board of Directors of the company shall maintain its control over the operations of such company and shall not divest itself of its duties and responsibilities to manage the affairs of such company for the benefit of the policyholders or members thereof.

4. The Board of Directors of the company shall determine the amount of compensation to be paid to officers, directors, employees, agents, and managers, which compensation shall be reasonable and shall be only for personal services rendered and reimbursement for actual and necessary expenses incurred, and the Board of Directors shall also fix and determine the length of time such officers, directors, employees, agents and managers shall be so engaged and compensated.

5. Any employment, general agency or general manager contract with the company shall have a reasonable cancellation provision whereby either the company or the employee, general agent, or general manager may cancel such contract for good cause.

    \*      \*      \*      \*      \*      \*      \*

B. A copy of every management contract, amendment thereto, or assignment thereof shall be filed with the Commissioner of Insurance. Copies of such contracts, amendments, or assignments as are now outstanding shall be filed by January 3, 1961, and all others shall be filed within ten days from the dates of their execution; or in the case of an assignment, within ten days from the date on which notice of assignment was received by the association or company.

1. The term "management contract" refers to any agreement for the rendition of services to the company or association, except such contracts as are to be performed within one year from the making thereof.

2. The Commissioner will neither approve nor disapprove such filed contracts, amendments, or assignments; but if he finds them to be contrary to law, he will take such action as he deems appropriate under the law.

The State Board of Insurance of the State of Texas conducts examinations of each year's operations of each insurance company which operates in the State of Texas. The report of the examination of Bankers Life for the period from January 1, 1963, to December 31,

1964, showed that the company had the following premium income for the years indicated:

|  | 1963 | 1964 |
|---|---|---|
| Membership fees | $8, 456. 06 | $4, 435. 10 |
| Other first-year premiums or assessments | 3, 722. 79 | 4, 639. 05 |
| Regular dues, premiums, or assessments, life | 3, 636. 15 | 3, 827. 10 |
| Regular dues, premiums, or assessments—health and accident | 318, 018. 73 | 292, 214. 91 |
| Additional premiums collected as a result of rate increase | 29, 880. 97 | 39, 646. 63 |

The report contained the following comments:

The business affairs of the Company are under the direct supervision of M. H. Hall in accordance with a management contract, dated October 27, [sic] 1947, between the Company and Mrs. D. C. Tabor which was subsequently assigned and transferred to M. H. Hall, under an assignment dated June 30, 1959. The contract provided that Mrs. Tabor was to be the sole managing head and director of all the affairs of the Company for a period of years equal to the life of the Company's charter. It was further provided under the contract that the management of the Company was to receive compensation for the management of all moneys directed to the Expense Fund, under the laws and regulations of the Department of Insurance of Texas, and that the management was to pay all operating expenses of the Company out of such compensation. The contract does not contain a cancellation provision.

The assignment of the above-described contract to M. H. Hall covered all rights, title, and interest Mrs. Tabor had in and to the charter of the company and everything pertaining to said Company that was owned by her as of June 30, 1959.

Under date of February 7, 1950, the Company entered into a general agency contract with M. H. Hall under which he was employed as manager of the Company's business, including office management, the production of business, the inspection and underwriting of risks, the settlement of claims, and all services necessary in the conduct of the business of the Company.

The existing manager's contract and the general agency contract between the Company and M. H. Hall are approved and ratified by the members each year at the regular annual membership meetings.

The following shows the amount of annual premium income on the books and records of Bankers Life on July 1, 1959, together with the amounts of this same business remaining on the books on the dates indicated and the percentages such amounts are of the July 1, 1959, amount:

| Annual premium income | Percentage remaining | As of— |
|---|---|---|
| $360, 000. 00 | | July 1, 1959 |
| $335, 433. 15 | 93 | Dec. 31, 1959 |
| $289, 323. 70 | 80 | Dec. 31, 1960 |
| $239, 338. 20 | 66 | Dec. 31, 1961 |
| $209, 692. 20 | 58 | Dec. 31, 1962 |
| $179, 717. 30 | 50 | Dec. 31, 1963 |
| 155, 008 . 15 | 43 | Dec. 31, 1964 |

Bankers Life on its Federal income tax return for the calendar year 1963 reported total income of $364,590, which included premiums,

other than first-year premiums and membership fees, of $321,655. On this return it reported expenses of $139,216, in addition to claims paid, and an operating loss of $26,380.23. Included in the expenses reported were commissions of $60,456.06, of which $52,000 was paid to petitioner.

Bankers Life reported on its Federal income tax return for the calendar year 1964 total income of $345,638, which included premiums, other than first-year premiums and membership fees, of $296,042. On this return it reported expenses totaling $130,934, in addition to claims paid, and an operating loss of $9,361.76. The reported expenses included commissions totaling $43,685, of which $39,250 was paid to petitioner.

Petitioner has been amortizing the $180,000, which he agreed on June 30, 1959, to pay to Tabor for assignment of the management contract on a 10-year useful life beginning with his income tax return for the calendar year 1960. In each of the years 1960, 1961, 1962, 1963, and 1964, petitioner deducted on his Federal income tax return $18,000 as amortization of this cost.

In a statutory notice of deficiency dated April 5, 1966, respondent disallowed the $18,000 deduction for amortization claimed by petitioner on his Federal income tax return for the calendar year 1964. In the same notice of deficiency, respondent increased petitioner's income by an additional $10,792.41 to represent an increase in the general fund of Bankers Life, as reflected on the tax return of Bankers Life for 1964. Petitioner filed his petition in this Court on April 20, 1966, alleging that both of the adjustments made by respondent in the notice of deficiency mailed to him on April 5, 1966, were erroneous.

Petitioner's tax return for the calendar year 1963 had been the subject of an office audit by the district director of internal revenue at Dallas and petitioner had received a notice dated September 16, 1965, that such return would be accepted as filed.

Petitioner filed a claim for refund of Federal income tax for the calendar year 1963 on November 16, 1966, in the amount of $3,923.41, giving as the basis of the claim that the reserve for expenses (general fund) of Bankers Life had decreased $7,078.61 during 1963.

Petitioner's attorney received a letter dated October 25, 1966, from an appellate conferee in respondent's Dallas office inviting him to a conference on November 17, 1966, concerning petitioner's tax liability for the calendar year 1964. The letter requested him to bring information regarding petitioner's management contract with Bankers Life and the placement of funds in the general fund of Bankers Life. The conference was not held on November 17, 1966.

By form letter dated February 2, 1967, respondent's representative requested petitioner to execute a consent to the extension of the statute

of limitations for assessment of a deficiency in income tax for the calendar year 1963. By form letter dated February 23, 1967, respondent's representative requested petitioner to appear for a conference on March 1, 1967, with an office auditor regarding his income tax for the calendar year 1963 and to bring with him information relating to the "reserve for expenses ($7078.61)" and "Amortization Insurance franchise ($18,000)."

Prior to petitioner's receipt of respondent's form letter dated February 23, 1967, a conference had been arranged for petitioner with an appellate conferee in the Dallas regional office of the Internal Revenue Service for March 8, 1967, regarding petitioner's income tax liability for the year 1964. The appellate conferee with whom the conference of March 8, 1967, was to be held mailed a letter dated February 27, 1967, to petitioner's attorney in regard to petitioner's income tax liability for the year 1964 in which he stated:

As you requested today, a conference has been scheduled in this case for 2 p.m. Wednesday, March 8, 1967.

Appellate Conferee J. W. Wellington (RIverside 9–3109) has the other case you referred to and will be present at the conference. Arrangements have been made for Special Attorney Harold L. Cook to be present and, if possible, arrangements will be made for Special Attorney John Dierker's attendance.

While you have shown some reluctance to submit the certified copy of the management contract involved in this case (and Appellate Conferee Joe Wellington is going to request the contract in his case), it seems that in the end it would be virtually impossible to recommend any acceptable disposition of this case without such document being a part of the record. So again I request that you present the management contracts involved in these cases at this conference.

At the March 1, 1967, conference with the respondent's office auditor regarding petitioner's income tax liability for the year 1963, petitioner's attorney raised the question of a second examination of petitioner's return for the year 1963. The auditor informed petitioner's attorney that he had performed the original audit of petitioner's income tax return for 1963 for a specific item only and that the filing of petitioner's claim for refund resulted in that return being reassigned to him. The auditor further informed petitioner's attorney that in verifying the claim he saw the amortization item on the return and decided that this claimed deduction required an explanation. Petitioner's attorney informed the auditor of the case which was pending for the year 1964 and asked the auditor to do whatever processing was necessary to permit petitioner's income tax liability for the year 1963 to be considered with the case involving petitioner's income tax liability for the year 1964. The auditor did not receive nor examine any records or other information belonging to petitioner at the March 1, 1967, conference or at any later time.

Either at the conference held March 8, 1967, or at some later conference, petitioner's attorney presented certain documents to respond-

ent's appellate conferee assigned to the case involving petitioner's income tax liability for the year 1964 for his examination.

After the March 1 meeting concerning petitioner's tax liability for the year 1963, the office auditor called respondent's appellate conferee who was handling the 1964 case and this conferee advised the office auditor to take a position on the amortization issue consistent with the treatment it had received for the year 1964 and to take an inconsistent position on the constructive income issue, that is, to disallow the claim for refund.

On March 17, 1967, respondent issued a statutory notice of deficiency to petitioner for the calendar year 1963 disallowing petitioner's claimed amortization deduction of $18,000. A statement attached to this statutory notice informed petitioner that if he filed a petition with this Court, his claim for refund should be made a part of his petition but if he did not file a petition with this Court an official notice of disallowance of his claim for refund for the year 1963 would be issued.

In his petition filed for the taxable year 1963 with this Court petitioner alleged that respondent's disallowance of his claimed amortization deduction of $18,000 was in error and claimed a refund because of the failure to deduct in the year 1963 the decrease in the reserve for expenses of Bankers Life. The parties by agreement have now disposed of the issue with respect to the reserve for expenses for both the year 1963 and the year 1964. Petitioner still contends that the notice of deficiency sent to him by respondent for the year 1963 is not valid because respondent did not comply with the requirements of section 7605 (b) of the Internal Revenue Code of 1954 relating to second examinations of a taxpayer's records.

OPINION

Petitioner takes the position that he purchased a business when he purchased the Bankers Life management contract from Tabor, relying on certain statements made by this Court, including statements made in *R. B. Cowden*, 34 T.C. 819 (1960). Petitioner then states that when a composite price has been paid for all of the assets of a business, that price must be allocated among the assets of the purchased business. Petitioner contends that the only asset of the business which he purchased when he acquired the management contract of Bankers Life was the right to all the portion of the premiums paid on insurance previously sold which was retained in the expense fund by the manager. Petitioner contends that the portion of the premiums which he purchased is comparable to and should be considered as "insurance renewal commissions."

Petitioner takes the further position that premium income from insurance on the books of Bankers Life on June 30, 1959, when he

was assigned the management contract of Bankers Life by Tabor, will no longer be on the books after a 10-year period, and, therefore, the payment he has made for the "insurance renewal commissions" should be amortized over a 10-year useful life.

If we accept petitioner's premise that when he was assigned the management contract of Bankers Life he acquired an insurance business distinct from his prior business as a general agent for Bankers Life, we do not agree that it follows that the amount petitioner paid for the assignment of this management contract was paid for "insurance renewal commissions" or that the rights which petitioner obtained upon the assignment to him of the management contract had any reasonably ascertainable useful life. None of the cases which have come to our attention involving the basis to a taxpayer of purchased "insurance renewal commissions" has involved the assignment of a contract comparable to the management contract of Bankers Life which petitioner in the instant case was assigned. The insurance renewal commissions cases such as *H. B. Hill*, 3 B.T.A. 761 (1926) ; *Lewis N. Cotlow*, 22 T.C. 1019 (1954), affd. 228 F. 2d 186 (C.A. 2, 1955) ; and *Frances E. Latendresse*, 26 T.C. 318 (1956), affd. 243 F. 2d 577 (C.A. 7, 1957), involved the assignment by a life insurance agent of his right to receive as a commission for a definite number of years a certain percentage of the renewal premiums paid by life insurance policyholders. In each of those cases the right to receive the renewal commissions would cease upon the expiration of the period of time over which the agent was entitled to receive such commissions. The problem in those cases was not whether the right to receive the renewal commissions had a reasonably ascertainable useful life, but the manner of the proration of the total purchase price over the known period of time during which the commissions on renewal premiums would be received.

In *Lewis N. Cotlow, supra*, there was also involved the question of whether the amount of commissions on renewal premiums in excess of the amount paid by the taxpayer there involved for the right to receive such commissions was capital gain or ordinary income. The taxpayer there was arguing that since his assignor received ordinary income and not capital gain on the amount paid him for the assignment of the renewal commissions the amount he received as renewal commission in excess of the allocable portion of the total payment for the assignment of the right to receive such commissions constituted capital gain. We held to the contrary.

In the instant case, the rights petitioner obtained upon the assignment to him by Tabor of the management contract with Bankers Life were not rights to "insurance renewal commissions." The contract which was assigned to petitioner provided that Tabor should be the

sole managing head and director of the affairs of Bankers Life for a period of years equal to the life of the charter of the company and that her compensation should be all money directed to the expense fund under the laws and regulations of the Department of Insurance of Texas and that she was to pay all expenses of Bankers Life. The expenses which Tabor was required to pay included amounts to be paid to petitioner in accordance with his agency contracts with Tabor and Bankers Life. Since Tabor's compensation was stated to be for managing the company, the logical interpretation of the contract is that at any time she or her assignee ceased the management of the company all rights under the contract to any portion of the receipts of the company ceased. In *Parrish* v. *Washington National Insurance Co.*, 421 S.W. 2d 117, 122 (Tex. 1967) the court stated with respect to commissions on renewal premiums:

It is quite clear that the weight of authority is to the effect that an agent cannot recover commissions on renewal premiums (absent an agreement to that effect) following the termination of his agency. Appelman, Insurance Law and Practice, Vol. 16, p. 495, § 9005; Couch on Insurance 2d Vol. 4, p. 371, § 26:400, p. 376, § 26:403: Cunningham v. Cunningham, 183 S.W. 2d 985 (Tex. Civ. App., 1944, no writ hist.); Allied Mutual Insurance Co. v. Roberson, 306 F. 2d 130 (4th Cir., 1962); Christensen v. Prudential Insurance Company of America, 204 S.W. 2d 459 (St. Louis Ct. of App., Mo., 1947).

"An insurance agent's right to renewal commissions must be derived from the contract itself; it is not a vested right." (Emphasis added.) Couch on Insurance 2d, Vol. 4, p. 372, § 26:400.

There were provisions in the contracts of August 14, 1945, and February 7, 1950, which petitioner had with Tabor and Bankers Life for payment of commissions on renewal premiums to petitioner. These rights, however, petitioner had separate and apart from the purchase of the management contract from Tabor and were not acquired by him in connection with the purchase of that contract. *United States* v. *Woolsey*, 326 F. 2d 287 (C.A. 5, 1963), involved the question of whether an amount received by a partnership upon the sale of its business resulted in ordinary income or capital gain. The court in that case concluded that the primary asset sold was the partnership's management contract with a mutual insurance company and that the consideration applicable to that asset should be treated as ordinary income. The small portion of the amount paid applicable to the operating records and goodwill and statewide charter of the mutual insurance company was held to constitute capital gain. The court described the management contract which was owned by the partnership, which contract was substantially the same as the contract which Tabor had with Bankers Life except that the term of the management contract there involved was for a period of 25 years. After setting forth the terms of the contract, the court stated that, "The partnership owned no right to any renewal commissions on any insurance, but both of

the brothers owned rights to renewal commissions for insurance written by them individually. Such rights to renewal commissions were not sold."

In *United States* v. *Eidson*, 310 F. 2d 111 (C.A. 5, 1962), the court held that the sale of a management contract which was comparable to the contract assigned by Tabor to petitioner in the instant case resulted in ordinary income to the assignor. The court in so holding stated at page 114:

It is, of course, not disputed here by the taxpayers that whatever net amount their contract would yield to them during the remaining life of the contract would be taxable to them as ordinary income. Therefore, if it be deemed, as we think it must, that the sum of $170,000, which they received for a transfer or assignment of their rights under the contract, represented their agreed amount as to the value of the contract to them, then the $170,000, in a very true sense, represented the present cash value of what would have otherwise been to them income received during the balance of the life of the contract. The fact that, as pointed out by the taxpayers, this income would not be received by the taxpayer unless they performed the services which the contract required of them, that is, actively managed the affairs of the insurance company in a manner that would produce a profit after all of the necessary expenditures, does not, it seems clear, affect the nature of this payment. It affects only the amount. That is, the fact that the taxpayers would have to spend their time and energies in performing services for which the compensation would be received merely affects the price at which they would be willing to assign or transfer the contract.

Here Tabor had entered into agreements with petitioner under which petitioner was to perform most of the management services she was required to perform and to be compensated for performing under her management contract. This, however, was merely her method of performing her services. She was nevertheless under her management contract receiving compensation for her services as manager.

Since what petitioner purchased was not renewal commissions, there is no basis in the record for amortizing the payment he made to Tabor for the management contract on any estimated period of time that premium income which was on the books at the date the management contract was assigned to petitioner might be expected to remain on the books.

We included in our facts the figures with respect to renewal premiums on which petitioner relied to support his estimate that he would no longer receive income from such renewal premiums after 10 years. In our opinion these figures do not support petitioner's contention that renewal premiums on insurance on the books of Bankers Life on the date of the assignment to petitioner of the management contract would have ceased after a 10-year period. The amount received from such renewal premiums shows a definite leveling off in decline after the first 2 years. However, as we have explained, in our view, petitioner purchased the total rights and privileges that went with the management of Bankers Life over such period of time as the management contract

which he had would remain in force and not merely a right to "renewal commissions." For this reason we do not consider it necessary to attempt to estimate how long renewal premiums might be received by Bankers Life from insurance on its books as of July 1, 1959.

Petitioner makes the point that even though the management contract stated that Tabor should be the managing head and director of all of the affairs of Bankers Life "for a period of years equal to the life of the Charter of the said Bankers Life & Loan Company," it was necessary for him to obtain ratification of this contract by the board of directors or the members of Bankers Life on a yearly basis since the State Board of Insurance of the State of Texas was unwilling to recognize perpetual management contracts without reasonable cancellation provisions. In *Mercury Life & Health Co.* v. *Hughes*, 271 S.W. 2d 842, 845 (Tex., 1954), the court had under consideration a claim by Hughes for breach of his contract to be manager of a statewide mutual assessment insurance company organized and existing under the laws of Texas. The court reached the conclusion that Hughes' contract was void for reason other than the fact that it had no cancellation provisions or specified term but stated as follows with respect to the lack of any such provisions in the contract:

We are much impressed with appellants' contention that the contract herein sued upon was void because it took from future directors and future policyholders of Mercury all right to have a voice in the management of the company, but inasmuch as we have held that it was void because passed by directors, all of whom had a direct personal financial interest in the contract, we deem it unnecessary to discuss this contention. * * *

If we accept petitioner's position that the provision for the continuation of the contract over the life of the charter of Bankers Life would not be enforced in Texas, it follows that petitioner acquired the rights of manager under this contract for as long as he or any assignee of his performed satisfactorily the management services of the company so as to have the members or board of directors of the company renew the contract. Viewed in this manner the contract takes on many of the aspects of a license which is renewable on a yearly basis. Such licenses have been held to have no reasonably ascertainable useful life. In *Morris Nachman*, 12 T.C. 1204 (1949), affd. 191 F. 2d 934 (C.A. 5, 1951), we held that a payment made by the taxpayer for a retail liquor vendor's license which was for 1 year but was renewable was an asset having an indeterminate useful life beyond the taxable year in which it was purchased since the issuing authorities of the license had for a number of years followed the practice of renewing the license of the previous holder.

In *Westinghouse Broadcasting Co.*, 36 T.C. 912 (1961), affd. 309 F. 2d 279 (C.A. 3, 1962), certiorari denied 372 U.S. 935, we held that a television network affiliation contract for a term of 2 years which was purchased by the taxpayer had an indeterminable useful life since the

network policy was to renew such contracts for an indeterminate period of time.

Therefore, if we accept petitioner's position that the contract which he acquired from Tabor was not in fact for the term of the charter, we have the situation of petitioner's acquiring a contract renewable for an indefinite and indeterminable period of time where he, through the obtaining of proxies, would substantially have control of its renewal absent failing to perform adequately under the contract.

Petitioner makes no point of the fact that by its terms the charter of Bankers Life would expire in 1979, 20 years after the date the management contract was assigned to him. The charter itself provided that the board of directors in the exercise of their discretion should have the right to renew and extend the charter from time to time for such length of time as is permitted or may be permitted by law. Petitioner testified that there was every reason to expect that the charter would be extended if the directors requested such an extension. The laws of the State of Texas allow the charter of a statewide mutual assessment insurance company to be extended. Article 14.14(a), Tex. Civ. Stat. (Vernon), added to the laws of Texas in 1963, specifically provides that any mutual assessment insurance company shall have the right to amend its charter for the purpose of extending its period of duration which may be perpetual by filing an amendment for such purpose within 6 months after the effective date of the provision. The act adding this provision to the Texas Code provided that the provisions of the added section should be deemed to be in addition to all other rights, authorities, and procedures existing under the laws of Texas.

Section 13.02 of Vernon Texas Civil Statutes provides that any mutual assessment insurance company may amend or extend its charter by compliance with the requirements in the General Corporation laws of Texas.

Not only from the provisions in Bankers Life's charter and the testimony of petitioner but also from the laws of Texas, we conclude that in substance Bankers Life's existence is not limited to the year 1979 since its charter may be extended by action of the board of directors. Since the management contract by its terms is for the life of the charter, which we interpret to mean the life of the charter as extended, the rights acquired by petitioner under the management contract are of indefinite duration if this provision of the contract is considered to govern. As previously stated, if the contract is considered to be one which is renewable yearly by the members and directors of Bankers Life, since by custom it is renewable yearly, the contract is likewise of indefinite and indeterminable duration.

We therefore conclude that the rights petitioner acquired under the contract have an indefinite and indeterminable useful life and therefore are not subject to amortization or depreciation under the

provisions of section 167, I.R.C. 1954, and section 1.167(a)(3), Income Tax Regs. Since petitioner has claimed no deduction with respect to the payments made for the management contract except deductions for amortization under section 167, we sustain respondent in his disallowance of the claimed deduction.

Petitioner contends that even if we conclude that he is not entitled to amortize the amount paid to Tabor for the management contract, we should find that there is no deficiency for the year 1963 because of the invalidity of respondent's notice of deficiency for that year. Petitioner contends that respondent made a second examination of his books for the year 1963 and because of such second examination any determination of a deficiency is invalid.

Section 7605(b) provides that taxpayers shall not be subjected to "unnecessary" examinations and that, "only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Secretary or his delegate, after investigation, notifies the taxpayer in writing that an additional inspection is necessary."

Respondent takes the position that he did not make a second examination of petitioner's books and records for the taxable year 1963.

Petitioner argues that respondent made a "surreptitious" second inspection of his records for the taxable year 1963 because of the information which the office auditor who was handling petitioner's claim for refund for the taxable year 1963 received in a telephone conference with respondent's appellate conferee, who was handling petitioner's tax liability for the year 1964.

We do not agree that the advice of respondent's appellate conferee who was handling petitioner's income tax liability for the year 1964 to the office auditor who was handling petitioner's income tax liability for the year 1963 to issue a notice of deficiency for the year 1963 disallowing the claimed amortization deduction of $18,000 constituted an examination of petitioner's books and records for the taxable year 1963.

The record does not show that petitioner turned over any records to the appellate conferee prior to the telephone conversation between the conferee and the office auditor. However, even if the action of the conferee and office auditor could be considered an examination of petitioner's books and records for the year 1963, that examination was not a second examination.

The evidence shows that there was no examination of petitioner's books and records for the year 1963 prior to the filing of petitioner's claim for refund for the year 1963. Prior to the filing by petitioner of his claim for refund, his income tax return for the year 1963 had been subject to an office audit. Such audit was not an examination of

petitioner's books and records. *Geurkink* v. *United States*, 354 F. 2d 629 (C.A. 7, 1965).

Petitioner relies on *Reineman* v. *United States*, 301 F. 2d 267 (C.A. 7, 1962), and *Pacific Mills* v. *Kenefick*, 99 F. 2d 188 (C.A. 1, 1938), in support of his contention. Both of these cases are distinguishable on their facts from the instant case.

In *Reineman* v. *United States, supra*, the court found as a fact, contrary to the testimony of respondent's agent, that there had been a second examination of records for a particular year. The court noted that the deficiency could not have been determined from the face of the return, from subsequent returns, or from records relating to the year 1964. The basis for the court's holding in *Reineman* v. *United States, supra*, supports respondent's position in the instant case.

*Pacific Mills* v. *Kenefick, supra*, involved an action by representatives of the Commissioner of Internal Revenue to enforce a summons requiring the taxpayer to produce books and records with respect to years which had previously been examined.

The appellate court held that a reexamination of the taxpayer's books and records was not "necessary" because it was not to be made "for the purpose of ascertaining the correctness of any return or for the purpose of making a return where none has been made," which were the only statutory purposes for a reexamination. The court stated that the evidence desired by the collector to defend against the suit for refund which had been instituted against him was obtainable by traditional means.[1]

Respondent in the instant case did not attempt to force petitioner to produce the books and records which he requested to pass upon petitioner's claim for refund for the year 1963 even though such records would have been necessary to verify petitioner's claimed decrease in expense fund in the year 1963 if respondent considered petitioner's claim, if factually correct, to be allowable. *Pacific Mills* v. *Kenefick, supra*, in no way supports petitioner's position in the instant case.

Since we hold that respondent did not make a second inspection of petitioner's books and records for the year 1963, it is unnecessary to discuss respondent's other contentions even though as respondent points out, the filing of certain types of claims for refund has been considered to be in the nature of a request for or consent to a second investigation. See *M. O. Rife, Jr.*, 41 T.C. 732 (1964), affirmed on this issue 356 F. 2d 883 (C.A. 5, 1966).

Because of the issues disposed of by agreement of the parties,

*Decisions will be entered under Rule 50.*

---

[1] The name of the collector was Nichols. In *Pacific Mills* v. *Nichols*, 31 F. Supp. 43 (D. Mass. 1939), the District Court granted discovery of the same records under the Rules of Civil Procedure for District Courts.