**Millard H. HALL and Mettie Burma Hall, Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 26567.

United States Court of Appéals
Fifth Circuit.

Jan. 28, 1969.

Claude R. Wilson, Jr., Hawkins Golden, Golden Burrow Potts & Boeckman, Dallas, Tex., for petitioners-appellants.

Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, Michael B. Arkin, Jonathan S. Cohen, Attys., Dept. of Justice, Lester R. Uretz, Chief Counsel, I.R.S. Washington, D.C., for respondent-appellee.

Before TUTTLE and GEWIN, Circuit Judges, and PITTMAN, District Judge.

TUTTLE, Circuit Judge:

The principal issue in this case is whether the taxpayer is entitled, under the depreciation statute, 26 U.S.C.A. § 167, (1964 ed.), to amortize the purchase price of a Texas insurance management contract over a ten year term.

Bankers Life & Loan Company was a Texas mutual assessment insurance company which sold assessment life, health and hospitalization insurance to the public. Such a company is technically a non-profit organization. Its members are the policyholders. The policyholders elect the board of directors and this board is charged with the general supervision of the company. The directors elect officers of the company and also select the manager who directs the operations of the company. The manager may employ general agents for the sale of insurance. He also controls all company policies, expenditures and operations. Most importantly, under the Texas law, such manager is permitted to retain a very substantial part of the annual premium income which he does not actually need to spend in the operation of the company's business. This company operated under the years in issue un-

der what is known as "Plan III" of the Plans of Premium Divisions approved by the State Board of Insurance for the state of Texas. This plan requires that 60% of premium income be put into the mortuary fund and that 40% may be put into the general fund, except that 100% of the first year premiums may be put into the general fund. All claims, except first year claims, are paid from the mortuary fund. All expenses and first year claims are paid from the general or expense fund. The policyholders may, with the approval of the State Board of Insurance, be assessed to meet claims if the mortuary fund is insufficient.

Thus, while such a company is not considered to be a profit operation, it may yield a handsome profit to the manager if he is able to manage the company, including the payment for required services and a reasonable service for management, at substantially less than the 40% of the annual premiums that are at his disposal in the general fund.

Prior to the years in question, D. C. Tabor was the owner of the management contract. In 1945 Tabor and the company made a contract with taxpayer to act as a general agent for the sale of accident, health, life and hospitalization insurance. Under this contract (which is not the contract in issue in this litigation) Hall was to receive one-half of the premium income that was regularly placed into the general fund—that is he was to receive one-half of the 40% of premium income as his commission for acting as general agent. Out of this he was to pay his own expenses, including the operation of the sales office for the insurance which was sold by the company. This, of course, left Tabor with the remaining half of the general fund, or the remaining 20% of the premium income, the unused portion of which would be his compensation, or profit from the management of the company.

Mr. Tabor having died, his widow sold her interest in the company, which amounted to her management contract,

to the taxpayer for the amount of $180,000.

The company was chartered in Texas on June 21, 1929, for a stated term of existence of 50 years, with the right to renew and extend the charter vested in the board of directors. It is not disputed by the parties that under the present laws of Texas and its policies the charter will be renewed if such renewal is requested by the board of directors. It is also not disputed that whatever action with regard to this matter may be desired by the owner of the management contract will be carried out by the board of directors, since proxies are regularly obtained from stockholders.

Under his earlier contract, not in issue here, taxpayer was entitled to a commission of one-half of the 40% of premium income received by the company each year as of which the net after expenses was his commission for selling the insurance. Under the later contract, he paid $180,000 to obtain the right to receive the remaining half of the 40% of annual premium income, which would remain his own personal property after the expenditure of the amounts necessary to conduct the affairs of the company. This is not a large company. The annual premium income shown on the books of the company on July 1, 1959, was $360,000.

Section 167 of the Internal Revenue Code of 1954 provides:

"(a) General rule.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

(1) of property used in the trade or business, or

(2) of property held for the production of income."

While conceptually it is a little difficult to view the sort of management rights acquired here, or, for that matter, any other intangible right as being subject to exhaustion, wear and tear, or the like, the Treasury regulations have long provided for limited application of this section of the statute to some intangibles. Section 1.167(a)(3) provides:

"*Intangibles.*

"If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill. For rules with respect to organizational expenditures, see section 248 and the regulations thereunder. For rules with respect to trademark and trade name expenditures, see section 177 and the regulations thereunder. (26 C.F.R., Sec. 1.-167(a)–3.)"

The taxpayer here claimed the right to amortize the cost of $180,000 paid by him for the management contract to Mrs. Tabor over a ten year life. This he arrived at by testifying that there was a "rule of thumb" of amortizing such a contract over a period from seven to ten years. He testified, "I was probably stretching the point a little bit, instead of using seven I stretched it out to ten."

The parties stipulated figures into the record showing the annual premium income for the years following the acquisition, covering the period December 31, 1959 through December 31, 1964. This showed a substantial decline in the annual premium income. However, at the trial of the case in 1967, the taxpayer testified that he could sell the management contract for approximately $200,-000, $20,000 more than he had paid for it nearly ten years previously. For the years 1963 and 1964, the Commissioner

of Internal Revenue challenged the deduction of $18,000 per year, which taxpayer claimed on his theory that he had purchased an asset in 1959 that had a reasonable life of ten years. The tax court supported the commissioner's position and held that the management contract purchased by the taxpayer was of an unascertainable duration, and, therefore, it was not subject to the provisions of Section 167 and the applicable regulations. This petition for review followed.

As is indicated by the section on depreciation itself, a deduction for depreciation is to permit the proprietor of a business or the owner of property to recover the cost of a wasting asset. Such deduction is intended to reflect the diminution and value of the asset as it is used. Detroit Edison Co. v. Commissioner, 319 U.S. 98, 101, 63 S.Ct. 902, 87 L.Ed. 1286. Throughout his brief, petitioner argues that what he bought for $180,000 was the "premium income which was already on the books at the time of purchase."[1]

Presumably by this petitioner means to equate the intangible assets purchased by him with a purchase of an absolute right to receive commissions on outstanding insurance where there are no further services to be performed either to keep the particular policies in force or to sell additional insurance. Even on that theory, to state that he bought the $180,000 premium income which was on the books is not, of course, technically correct. The books on July 1, 1959, showed premium income of $360,000. Petitioner testified that since he already had paid for and received the right to one-half of the 40% general fund under his agency commission agreement, he and Mrs. Tabor agreed on a purchase price of one-half of the amount of premiums on the books, or $180,000. However, he testified that the purchase price was arrived at in a different manner. He testified that the

usual price paid for such a management contract was what he described as "an amount being equal to ten months premium or thereabouts." The record is silent as to any connection between what the petitioner meant by "ten months premium or thereabouts," and the figure of $360,000, or half of that amount, $180,000, which appeared on the books as of July 1, 1959.

Moreover, the management contract purchased by Mr. Hall was something entirely different. He, of course, would benefit from the keeping on the books of the company all of the policies that were there at the time of the purchase, to the extent of his ability to do so. But this, of course, is not what he bought at all. He would benefit equally by every dollar of premium income he could generate by selling new policies.

It may be possible that for the purpose of buying such a management contract, parties dealing at arm's length in Texas, have "a rule of thumb" by which they estimate that the particular policies on the books at any one time will all have expired, lapsed, or become the basis of claims and thus paid off within a period of seven to ten years. Figures introduced on behalf of the petitioner do show that at the end of the sixth year, there had been a substantial decrease in the annual premium income on the books of the company. However, and this seems highly significant, he testified on the date of trial, which was some eight years after the date of purchase, that he could then sell the contract, for which he paid $180,000 in 1959, for $200,000—hardly a wasting asset. The distinction between the asset acquired by Mr. Hall and the acquisition of a mere right to receive commissions already earned lies in the fact that he could run this company, sell as much additional insurance as he could place and be entitled to a large proportion of the 40% of each year's annual premiums both on old policies and

---

1. The brief states, "The facts are undisputed in this case that the only asset that Mr. Hall acquired from Mrs. Tabor by purchasing the management contract was the premium income which was already on the books as a result of prior sales of insurance policies."

on newly placed policies received by the company during its life. As stated by the Tax Court, the petitioner makes no point of the fact that by its terms the charter of Bankers Life would expire in 1979, twenty years after the date the management contract was assigned to him. This apparently is due to the fact that petitioner testified that there was every reason to expect the charter would be extended if the directors requested such an extension. This is customary under the operation of the Texas insurance statutes. See Article 14.14a Vernon's Ann.Tex. Civil Statute. We think the Tax Court was fully justified in finding "not only from the provisions in Bankers Life charter and the testimony of petitioner, but also from the laws of Texas, we conclude that in substance Bankers Life's existence is not limited to the year 1979, since its charter may be extended by action of the board of directors. Since the management contract, by its terms, is for the life of the charter, which we interpret to mean the life of the charter as extended, the rights acquired by petitioner under the management contract are of indefinite duration if this provision of the contract is considered to govern. As previously stated, if the contract is considered to be one which is renewable yearly by the members and directors of Bankers Life, since by custom it is renewable yearly, the contract is likewise of indefinite and indeterminable duration." See Nachman v. Commissioner of Internal Revenue, 5 Cir., 1951, 191 F.2d 934, in which this court held that a payment made by a taxpayer for a retail liquor vendors license which was for one year, but was renewable, was an asset having an indeterminate useful life beyond the taxable year in which it was purchased. This court said, "This renewal privilege being of indefinite duration, dependent upon petitioner's wishes as well as upon the city's future course of action, there is no rational basis for prediction as to duration." 191 F.2d 934, 936.

■ We conclude that the Tax Court had no course other than to hold, as it did, that a management contract that gave an indefinite right to the purchaser to operate the company in a manner that would produce income for an indefinite period in the future, and which actually had a value, according to his estimation, eight years after his acquisition, substantially higher than the price he had paid for it was not subject to amortization or depreciation under the provisions of Section 167 IRC, 1954, and Section 1.167(a) (3) Income Tax Regulations. Nachman v. Commissioner of Internal Revenue, supra,; KWTX Broadcasting Co. v. Commissioner of Internal Revenue, 5 Cir., 1959, 272 F.2d 406 and Gant v. Commissioner of Internal Revenue (6 Cir., 1959) 263 F.2d 558. See our discussion of this issue in E. T. Griswold, et al v. Commissioner of Internal Revenue, (5 Cir., 1968) 400 F.2d 427 (published September 3, 1968).

■ We have considered petitioner's contention that a second examination of his books and record was made by the Internal Revenue Service, in contravention of the "one inspection" rule of Section 7605(b) of the Internal Revenue Code of 1954. We conclude that there was ample basis for the finding of fact by the Tax Court to the effect that there was no second examination of taxpayer's books and records as contemplated under said section. Here there was no examination of taxpayer's books of account for the year 1963 by the examining agent. We agree with the statement by the Court of Appeals for the Seventh Circuit in Geurkink v. United States (7 Cir., 1965), 354 F.2d 629, where it stated: "We emphasize that § 7605(b) relates to a second examination of *books of account* of a taxpayer. * * *" (Emphasis supplied) 354 F.2d 629, 631.

■ As to taxpayer's challenge of the refusal of the Tax Court to grant his motion for a further and better statement, we are unable to find from the record that petitioner was in any way prejudiced in his preparation or presentation of his case by such denial. The issue was posed by the explanation given in

Schedule 1, "It is determined that the amount of $18,000 claimed as an expense or amortization of insurance franchise is not an allowable expense on your income tax return. Therefore, the claimed expense has been disallowed." It is apparent from the preliminary statement by counsel for petitioner at the trial what was the issue to be resolved. He stated that "the only asset that was acquired in this case was the premium income which was on the books, and that the expected life of this premium income was not in excess of the ten years. That Mr. Hall was writing this purchase price off." This remained the issue throughout the case and is the issue that was decided by the Tax Court. It is difficult to see how any further or better statement of the respondent's theory would have aided petitioner in presenting the case.

The decision of the Tax Court is affirmed.