Marte A. Formico and Eula J. Formico v. Commissioner.
Formico v. Commissioner
Docket No. 629-70.
United States Tax Court
T.C. Memo 1971-171; 1971 Tax Ct. Memo LEXIS 161; 30 T.C.M. (CCH) 732; T.C.M. (RIA) 71171; July 21, 1971, Filed Herman P. Scampini, Jr., 1920 Mill Tower, San Francisco, Calif., for the petitioners. Randall G. Dick, for the respondent. 733 FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined a deficiency in petitioners' joint Federal income tax for the years 1966 and 1967 in the amounts of $3,836.33 and $3,977.75, respectively. Concessions having been made, the only issue remaining for decision is whether petitioners are entitled to amortize under section 167[1] the cost of a management contract purchased by Marte *162 A. Formico. Findings of Fact Some of the facts have been stipulated. The stipulations and exhibits attached thereto are incorporated herein by this reference. Petitioners herein are Marte A. Formico (hereinafter sometimes referred to as Marte or petitioner) and his wife, Eula J. Formico, who both resided in Saratoga, California, at the time the petition herein was filed. They filed joint Federal income tax returns for the years in issue with the district director of internal revenue at San Francisco, California. On April 1, 1965, Marte purchased all of the right, title, and interest in Grover M. Swofford's (hereinafter sometimes referred to as Swofford) "business as insurance agent and District Manager" for Farmers Insurance Exchange, Farmers Truck Insurance Exchange, Farmers Fire Insurance Exchange, and Mid-Century Insurance Company and in his business as "Registered Representative" of Farmers New World Distributing Company (hereinafter sometimes referred to collectively as Farmers). The agreement read as follows: AGREEMENT OF SALE This Agreement, made and entered into *163 this 1st day of April 1965, by and between GROVER M. SWOFFORD residing at 1435 Calaveras Avenue, San Jose, California, herein called the "Seller" and MARTE A. FORMICO, residing at 3293 Lynn Oaks Drive, San Jose, California, herein called the "Buyer". WITNESSETH: WHEREAS, the Seller now is the District Manager for the organizations comprising the Farmers Insurance Group and is engaged in business as an Insurance Agent in that certain territory known as District 81-92, generally comprised of City of San Jose, County of Santa Clara, State of California, and the adjacent area. NOW THEREFORE, it is mutually agreed as follows: 1. Seller hereby sells to the Buyer all of Seller's right, title and interest in: (a) Seller's insurance business as insurance agent and as District Manager for Farmers Underwriter Association, representing the Farmers Insurance Exchange, Truck Insurance Exchange and Fire Insurance Exchange, respectively, and as Insurance Agent and District Manager for Mid-Century Insurance Company and for Farmers New World Life Insurance Company, and as Registered Representative of the New World Distributing Company, including the goodwill of said business but not including *164 renewals and expirations which are and remain the property of the associations and companies. (b) All furniture and fixtures used in connection with said business and described in Schedule "A" attached hereto. Seller represents that all of said properties are owned by him free and clear of liens and encumbrances. 2. As consideration for the above described transfers, Buyer shall pay to Seller the sum of $129,440.25 (One Hundred Twenty-Nine Thousand Four Hundred Forty Dollars and Twenty-Five Cents) which sum shall be payable as follows: (a) $37,537.67 (Thirty-Seven Thousand Five Hundred Thirty-Seven Dollars and Sixty-Seven Cents) shall be paid upon the execution of this Agreement. (b) The balance of $91,902.58 (Ninety One Thousand Nine Hundred Two Dollars and Fifty-Eight Cents) shall be paid in equal monthly installments of $957.22 (Nine Hundred Fifty-Seven Dollars and Twenty-Two Cents) plus interest at the rate of Six Percent (6%) per annum, payable as follows: $957.22 (Nine Hundred Fifty-Seven Dollars and Twenty-Two Cents) on the fifteenth day of January, 1966, and $957.22 (Nine Hundred Fifty-Seven Dollars and Twenty-Two Cents) on the fifteenth day of each month thereafter *165 until the entire principal is paid in full. Accumulated interest on the unpaid principal balance shall be payable at the time of the payment of each installment of the principal and if not then paid shall bear like interest as the remaining unpaid balance of the principal. In the event of default in the payment of any installment of principal or interest on or before the due date and such default continues for Fifteen (15) days, then, at the option of Buyer, the entire unpaid principal with accumulated 734 interest thereon shall forthwith become due and payable. In the event of suit upon this Agreement, Buyer agrees to pay reasonable attorneys fees to be fixed by the court and other costs and charges incurred. 3. Seller shall: (a) Turn over to the Buyer all current records of every description pertaining to said portion of the Agency. (b) Relinquish to the Buyer Seller's right to the telephone number now assigned to the Farmers Insurance Group and Seller agrees that the said telephone number shall not be listed in connection with his name, but that said listing may only be made in connection with the name of the Buyer, the Seller hereby agreeing that he will make necessary *166 representation to the telephone company to give full force to this Agreement. 4. Seller agrees that for the protection of the goodwill transferred hereunder, Seller will not, for a period of one (1) year from the date hereof, either alone or jointly, or as an agent or employee of anyone, and neither directly or indirectly, carry on or be engaged, employed or interested in any insurance business within the geographic limits of said district, nor within said term, in any manner whatsoever, solicit or accept the custom, trade or business of any customer of the said business hereby sold, nor attempt to induce directly or indirectly any agent of the organization comprising the Farmers Insurance Group to terminate or otherwise abandon their agency agreements with said organizations, nor do any other act or acts that shall prejudice the business hereby sold or the rights of the Buyer therein, except as an agent for the companies comprising the Farmers Insurance Group. 5. Seller shall not at any time disclose to any person, firm or corporation (other than the Buyer) the names or addresses or other identification of any person listed on the above mentioned records of the Farmers Insurance *167 Group. 6. This Sale shall take effect immediately upon the signing of this instrument and the Seller hereby authorizes the Buyer, in the Seller's name but at the Buyer's own cost and expense, to collect the outstanding accounts of such business and to give receipts and to receive, endorse and collect any and all checks made to the order of the Seller and delivered or sent in payment of any of the above mentioned accounts. IN WITNESS WHEREOF, the parties hereto have hereunto affixed their signatures the day and year first above written. /S/ Grover M. Swofford 4-1-65 Grover M. Swofford SELLER /S/ Marte A. Formico 4-1-65 Marte A. Formico BUYER Addendum All folios payable prior to the effective date of this Agreement shall be paid to SELLER. All folios payable after the effective date of this Agreement shall be paid to BUYER. /S/ Grover M. Swofford 4-1-65 /S/ Marte A. Formico 4-1-65 On the same date as the purchase agreement, Marte was appointed district manager for Farmers' district 81-92 (hereinafter sometimes referred to as district 92). Between August 1957, and the purchase agreement date, Swofford had been manager of that district, pursuant to a "District *168 Manager's Appointment Agreement" with Farmers that read as follows: DISTRICT MANAGER'S APPOINTMENT AGREEMENT Farmers Underwriters Association, Truck Underwriters Association and Fire Underwriters Association, each a corporation (hereinafter called "Associations"), each acting in its own behalf and for and as Attorney-in-Fact for the Farmers Insurance Exchange, Truck Insurance Exchange and Fire Insurance Exchange, respectively (hereinafter called the "Exchanges"); Mid-Century Insurance Company, a corporation (hereinafter called "Mid-Century"), acting in its own behalf; and Farmers New World Life Insurance Company (hereinafter called "Farmers New World"), acting in its own behalf; Each hereby appoint Grover M. Swofford, (hereinafter called the "District Manager") as a District Manager of and for the Associations, the Exchanges, Mid-Cen-tury and Farmers New World, respectively (all hereinafter collectively called the "Companies") in District No. 92, in the State of California, effective August 1, 1957, and continuing until terminated or cancelled as provided herein, under the following terms and conditions: A. The Associations and Mid-Century, respectively, agree in consideration *169 of the District Manager's Agreements: 1. To pay to the District Manager for all business produced by him and written by the Exchanges and Mid-Century, respectively, production and service commissions and underwriting, claims, production, or other bonuses in accordance with scale and rules adopted from time 735 to time by the Exchanges, Associations and Mid-Century, respectively; 2. To provide Ad-Aid assistance to the District Manager in such amounts as are regularly provided for like agencies and like districts; 3. To pay to the District Manager commission for the settlement of claims on such schedule as may be determined from time to time by the Exchanges and Mid-Century, respectively. B. The Associations further agree to arrange for group life insurance for the District Manager, in such sum and under such conditions as shall be provided for by rules of the Associations or Exchanges, and to regularly pay their proportion of the premiums required for such insurance. C. The District Manager agrees, in consideration of the agreements of the Companies herein contained: 1. To actively represent the Companies in the production of business of all types written by them; to *170 offer and place only with the Companies all business acceptable to them, and to represent no other insurer without the written consent of the Companies; 2. To conform to all regulations, operating principles and standards of the Companies, and to diligently handle and settle claims, and to provide claims and other service to policyholders of the Companies; 3. To maintain adequate records of all business transacted and make them available for audit by representatives of the Companies at all reasonable times; to surrender on cancellation or termination of the agency or this agreement, all records, cards, books, manuals, papers, forms, or other material of whatsoever kind, and all copies thereof, whether or not furnished by any of the Companies, having to do in any manner with the business of the Companies; 4. To maintain telephone service under the name of "Farmers Insurance Group" and the District Manager, with the cost to be allocated in accordance with the rules and regulations of the Companies, and to execute concurrently herewith an irrevocable Request for Supersedure and Power of Attorney concerning said telephone service, in favor of Farmers Underwriters Association or his *171 assignee, to be effective in the event of cancellation or termination of this agreement or the agencies created hereby. Upon such cancellation or termination, the District Manager, his heirs or personal representative shall also assign, without charge to Farmers Underwriters Association or its assignee, all of the District Manager's right, title and interest in such telephone service and number; 5. To recommend for appointment and train as many Agents as may be required to produce sales commensurate with the potential of the territory assigned herein, as agreed on by both parties to this contract; failure to conform with this Paragraph shall be grounds for immediate cancellation of this Appointment Agreement. 6. To collect from the Agents in the District, and to promptly transmit to the Companies all premiums, membership fees and other amounts received by said Agents for the account of the respective Companies, and to assume the obligation for the payment of, and to promptly pay to the Companies any and all such amounts which are for any reason not collected from said Agents. D. This agreement and the agencies created hereby shall terminate upon the death of the District Manager, *172 and may be cancelled by either the District Manager or the Companies on thirty (30) days written notice; provided, however, that in the event of fraud or embezzlement of funds of any of the Companies by the District Manager, or the failure to promptly remit such funds in accordance with prescribed rules, or the contacting, directly or indirectly, of any policyholder of any of the Companies for the purpose of switching insurance to any other insurer, cancellation may be effected immediately. E. It shall be a condition precedent to the District Manager's right to receive any commissions, fees, bonuses, benefits or compensation, or any portion or installment thereof, including any deferred commissions, that he be an agent of record of the Companies as to the date when they are payable in accordance with the rules of the Companies, and, in the event of cancellation or other termination of the agreement, or the agencies created hereby, they shall not be considered as earned by the District Manager unless they are due and payable, in accordance with said rules prior to the effective date of such cancellation or other termination, the District Manager hereby waiving any and all right to *173 receive any of the same after said date, and agreeing that no payment of any kind shall thereafter be made. It is agreed on the part of the Companies that the District Manager shall not be liable to them for any return or "charge-back" of commissions on account of policy cancellations made after the cancellation of this agreement or the agencies created hereby. F. In the event of cancellation or other termination of the agencies created hereby for any reason whatsoever, except where a right of immediate cancellation exists for any of the reasons set forth in Paragraph "D" above, the Companies agree to give first consideration 736 to a written nomination of his successor by the District Manager, or in the case of his death, by his heirs or personal representative, provided such nominee is in all respects acceptable to the Companies. It is further agreed that the District Manager or his heirs or personal representative may negotiate with such nominee for reasonable compensation for the value of such nomination and such good will as may attach to the agencies. Such nomination and all negotiations and agreements between the District Manager, or his personal representative, and *174 an acceptable nominee must be completed and the nominee ready, willing and able to replace the District Manager within thirty days from and after the mailing or personal service of notice of cancellation or termination of these agencies, or in the event of termination by reason of the District Manager's death, within thirty days thereafter. Time is of the essence, and upon the expiration of said thirty day period, unless the same is extended in writing by the Companies, the District Manager shall have no further privilege to nominate, or right, rule or interest in and to or arising out of the Appointment Agreement or agency, including the good will thereof. It is further agreed that the privilege granted to the District Manager in this Paragraph shall immediately lapse and be void if the District Manager shall fail to remit funds in accordance with prescribed rules, or directly or indirectly make any contact with any policyholder of any of the Companies for the purpose of switching insurance to any other insurer, or shall be guilty of fraud or embezzlement of any of the Companies' funds. The District Manager further agrees that the amount of the above mentioned reasonable compensation *175 for the value of said nomination and good will of the agencies will in no event, except with the written consent of the respective Companies, exceed an amount equal to, (a) five times the District Manager service commissions paid to the District Manager during the six month period immediately preceding the date of cancellation or other termination of this agreement on business written in the Exchanges; (b) two and one-half times the District Manager service commissions paid to the District Manager during the twelve month period immediately preceding the date of cancellation or other termination of this agreement on business written by MidCentury; and (c) five times the District Manager service commissions paid to the District Manager at the end of the two quarterly periods next preceding the date of cancellation or other termination of the agreement on business written in Farmers New World. No Agent Service commissions paid to the District Manager shall be included in establishing the aforementioned value. G. The District Manager further agrees that in the event of cancellation or other termination of this agreement, or of the agencies created hereby, by either party, he will, subject *176 to the approval of the Companies, in consideration of the compensation received by his nomination of a successor, sell the good will of the insurance agency to the nominee named in accordance with Paragraph "F" hereof, and further agrees that as long as the buyer, or any person deriving title to said good will from such buyer, carries on such business or agency up to a period of one year from date of sale, he will neither directly nor indirectly, as an individual, employee, agent, partner, or otherwise carry on, or engage in, any insurance business within the county or counties in which the District above referred to is located, or within the immediately adjoining counties, nor for said period, and within said territory, solicit or accept the custom, trade, or business, or interfere with the policy contract of any members or policyholders of the Exchanges, MidCentury or Farmers New World, and the District Manager further agrees, that at the time of said sale, he will enter into a contract containing all of the foregoing provisions, with such nominee. The District Manager further agrees that he will not, at any time after any such cancellation or termination of this agreement, or the *177 agencies created hereby, interfere with the agency contracts of any of the agents of the Companies by either directly or indirectly soliciting or urging any of said agents to cancel their agency contract, or otherwise terminate their agencies with any of the Companies. H. The District Manager specifically agrees that all renewals and expirations, as well as any and all rights or privileges for the continuing effectiveness of all policies produced on behalf of the Exchanges, Associations, Mid-Century and Farmers New World including all records pertaining thereto, are and shall at all times remain the property of the Associations, Mid-Century and Farmers New World, respectively, and the District Manager waives any and all right, title and interest in and to the same, and nothing herein or elsewhere contained is intended to, or shall be construed to entitle him to the same or any interest therein. 1. Nothing contained herein is intended or shall be construed to create the relationship of employer and employee. The time to be expended by the District 737 Manager is solely within his discretion, and the persons to be solicited and the area within the district involved wherein solicitation *178 shall be conducted is at the election of the District Manager. No control is to be exercised by the Companies over the time when, the place where, or the manner in which the District Manager shall operate in carrying out the objectives of this agreement, provided only that they conform to normal good business practice and to all State and Federal laws governing the conduct of the Companies and their agents. J. This agreement cannot be modified, nor any of its terms waived or changed except by written agreement of the parties hereto, and it supersedes all prior agreements or contracts, written or verbal, previously entered into by the parties hereto. K. In addition to Paragraphs "C" to "J" above, both inclusive, which apply to the District Manager's appointment as agent for all Companies, the following provisions shall apply only to his appointment as agent for Farmers New World. 1. The District Manager shall be an agent of and for Farmers New World to solicit applications for insurance on the lives of individuals, to collect and pay over all premiums received as directed by the Company, and to perform such other duties as are hereinafter stated, and for no other purposes whatsoever; *179 2. The District Manager shall have no authority to bind Farmers New World in any way, nor to waive any forfeiture or any of the Farmers New World's customary requirements; 3. The District Manager shall promptly deliver to Farmers New World all applications obtained by him, and shall strictly observe all the rules and regulations of Farmers New World now in force, or such as may be adopted from time to time; 4. The District Manager agrees to keep and render full and true accounts of all business done by or through him and of all money or property received and collected by him whenever required by Farmers New World, which, on the other hand, agrees to furnish the District Manager with a copy of any ledger entries of has account made subsequent to those appearing on any previous copies so furnished, but not more often than once a month; 5. No expenses or charges of any kind, except those specifically allowed in writing, shall be paid by Farmers New World; 6. In consideration of the agreements of the District Manager, Farmers New World will pay the District Manager commissions, renewals and bonuses as announced and determined in schedules of commissions and rules and regulations *180 adopted by Farmers New World from time to time. WITNESSES: /S/ Laura E. Bettencourt Witness /S/ Paul Fisher Witness for District Manager Farmers Underwriters Association Truck Underwriters Association Fire Underwriters Association, For Themselves and as Attorneys-in-Fact for Said Exchanges; Mid-Century Insurance Company
Farmers New World Life Insurance Company
By [Illegible] 7/23/57 For the Associations, Date Exchanges and Companies /S/ Grover M. Swofford District Manager Date Marte's appointment agreement with Farmers was essentially the same as the above agreement. Swofford received service commissions from Farmers in the amount of $24,948.05 for the six-month period preceding the date of sale. Pursuant to the formula in paragraph F of Swofford's district manager's agreement, an amount equal to five times the above service commission figure, i.e., $124,740.25, was "reasonable compensation" for the value of his nomination of Marte as district manager. This amount exactly equaled the difference between the total price paid by Marte ($129,440.25) under the purchase agreement and the cost of Swofford's furniture and fixtures ($4,700). The purchase *181 agreement had to be approved by Farmers and had to conform to contracts prepared by it. Farmers required that the agreement refer to the sale of goodwill and that it contain a covenant not to compete. The parties themselves never discussed goodwill or the covenant not to compete in their negotiations. For over two years, prior to purchasing Swofford's rights, Marte had been employed on a salary basis by Swofford in his insurance business. During this period Marte was responsible for running district 92, promoting business for it and recruiting, training and supervising local agents. Swofford limited his own activities mainly to overseeing the operations. 738 The business was conducted under the name of Farmers, not Swofford's. Likewise the office sign and the telephone for the office were in Farmers' name. These facts remained unchanged after Marte's appointment. Upon Marte's appointment as district manager, he gained access to all business records and policy files of the district. These files contained the names of policyholders, their addresses, expiration dates of their policies, types of insurance and property insured. In addition, Marte obtained access to all records *182 and information regarding renewals and expirations. The policy structure of district 92 at the time of Marte's appointment consisted of (1) six-month automobile policies written by Farmers Insurance Exchange; (2) sixmonth automobile policies written by Mid-Century Insurance Company; (3) one-year insurance policies written by Fire Insurance Exchange; and (4) six-month and one-year commercial truck policies written by Truck Insurance Exchange. All policies written in the district were automatically renewable unless canceled and all renewal and billing notices were sent out by Farmers. The district manager did not write or service the policies of his district nor did he handle claims of policyholders. Generally, his duties were to represent Farmers, promote its business and recruit, appoint and train local agents. The local agents themselves were independent contractors operating out of individual offices and they were responsible for writing and servicing the policies of the district. When marte was appointed in 1965, there were approximately 15 local agents operating within the district. At the time of trial there were approximately 22 local agents of which approximately eight *183 remained from the original 15. As part of its normal business operation, Farmers computed what is known as lapse ratios. These were defined as the percentage of policies in existence at the beginning of the measuring period (usually six months), which as a result of nonpayment of premiums were no longer in existence at the end of that period. The ratios did not take into account lapses resulting from legal cancellations, from policyholders dying or moving to another district, from underwriting cancellations or from the sale of insured property. Nor, in determining the ratios, did Farmers take into account policies that might have been added during the measuring period. These policies were reflected in subsequent measuring periods. Farmers' records for the period July 1961 through December 1970, indicated that the lapse ratios for district 92 were as follows: Period
* Farmers
** Mid-Century
July through December 1961
5.55%
N/A
January through June 1962
5.76%
N/A
July through December 1962
5.33%
N/A
January through June 1963
5.87%
N/A
July through December 1963
5.51%
N/A
January through June 1964
5.22%
N/A
July through December 1964
6.03%
N/A
January through June 1965
5.55%
N/A
July through December 1965
4.03%
N/A
January through March 1966
5.26%
N/A
April through June 1966
5.70%
N/A
July through September 1966
5.48%
N/A
October through December 1966
6.12%
N/A
January through March 1967
6.91%
N/A
April through June 1967
No records
available
July through September 1967
No records
available
October through December 1967
No records
available
January through March 1968
No records
available
April through June 1968
No records
available
July through December 1968
6.9%
24.8%
January through June 1969
7.0%
23.4%
July through December 1969
8.1%
22.5%
January through June 1970
8.6%
25.0%
July through December 1970
7.5%
27.5%
*184 739 In addition, Farmers' records indicated that loss of policies in any district resulting from underwriting cancellations, from policyholders dying or moving to other districts and from sale of the insured property was an average three percent for a six-month period. On December 1, 1966, Marte executed a new district manager's appointment agreement which provided that in the event of cancellation or termination, Farmers would have the option to buy out the district manager at "contract value" which was defined (as in Marte's original agreement with Farmers) as a multiple of the service commission paid the district manager. At the time of trial, it was the policy of Farmers to exercise their option in the event of cancellation and to pay the "contract value." Marte, when he retires, plans to sell his management contract to Farmers for a consideration greater than that which he had paid Swofford. In their joint Federal income tax returns for 1966 and 1967, petitioners claimed an amortization *185 deduction of $12,367 in each year for Marte's management contract. In his statutory notice of deficiency, respondent denied the deduction in toto, on the ground that Marte purchased intangible contract rights which were the equivalent of goodwill having an indeterminate useful life. Opinion Marte purchased all the right, title and interest in Swofford's "insurance business." Petitioner contends that the only right which he acquired was the right to receive renewal commissions on the policies of district 92 existing at the time of purchase; that this right has a definitely ascertainable life span which does not exceed ten years; and that its cost, therefore, may be amortized pursuant to section 167. [2] Alternatively, petitioner argues that he acquired access to the use of business records and policy files of the district. According to him, this right was subject to exhaustion as insurance policies in existence on the date of the purchase agreement lapsed, and the period over which the right to access would become obsolete did not exceed 10 years; therefore, the asset is amortizable pursuant to section 167. *186 On the other hand, respondent argues that Marte did not purchase the right to insurance renewal commissions; rather, he purchased the right to be manager of district 92, which included the right to collect a commission while manager on all policies of the district. According to respondent, this right is an intangible asset with an indefinite and uncertain life span; hence, it cannot be amortized under section 1.167(a)-3, Income Tax Regs.[3]
*187 In order to amortize an intangible asset, it must be shown that the asset has a limited useful life, "the length of which can be estimated with reasonable accuracy." Sec. 1.167(a)-3, Income Tax Regs. As pointed out in Detroit Edison Co. v. Commissioner, 319 U.S. 98, 101 (1943), the asset must be a wasting asset, since the end purpose of section 167 is to - approximate and reflect the financial consequences to the taxpayer of the subtle effects of time and use on the value of his capital assets. For this purpose it is sound accounting practice annually to accrue * * * an amount which at the time it is retired will with its salvage value replace the original investment therein. * * * We do not believe that the asset acquired by Marte meets these requirements for amortization. Under clause H of Swofford's appointment agreement with Farmers, all "renewals and expirations, as well as any and all rights or privileges for the continuing effectiveness of all policies * * *, including all records pertaining thereto" were and at all times remained the property of Farmers. Likewise, under Marte's appointment agreement: 740 H. All renewals *188 and expirations, as well as any and all rights or privileges for the continuing effectiveness of policies produced on behalf of any of the Companies, including all records pertaining thereto, are and shall at all times remain the property of the Companies, and the District Manager waives any and all right, title and interest in and to the same, and nothing herein or elsewhere contained is intended to, or shall be construed to entitle him to the same or any interest therein, it being specifically understood and agreed that the District Manager shall have no interest, assignable or otherwise, in any policies in force, eithe during the continuance of this Agreement or upon cancellation or termination. It is further understood and agreed that all lists and records of any kind pertaining to policyholders or expirations, and also the information contained therein, are the secret and confidential property of the COMPANIES and shall never be used or divulged except as specifically authorized by, and for the benefit of, the COMPANIES. Thus, it is clear that Swofford had no right to renewal commissions which he could sell, nor did Marte receive such rights from him. The fact that the purchase *189 price under their agreement of April 1, 1965, was determined according to a multiple of the service commissions received by Swofford on policies in effect for a six-month period preceding purchase, does not imply anything to the contrary. Roy W. Johnson, 53 T.C. 414, 425 (1969). Accordingly, Marte did not receive any right to renewal commissions. Since Marte did not acquire the right to renewal commissions, cases such as H.B. Hill, 3 B.T.A. 761 (1926); Lewis N. Cotlow, 22 T.C. 1019 (1954), affd. 228 F. 2d 186 (C.A. 2, 1955); and Frances E. Latend 26 T.C. 318 (1956), affd. 243 F. 2d 577 (C.A. 7, 1957), which were cited by petitioners, are inapplicable. They involved the assignment by life insurance agents of their rights to receive for a definite number of years a certain percentage of the renewal premiums paid by life insurance policyholders. The issue involved in those cases was the manner of the proration of the total purchase price over the known period of time which commissions or renewal premiums would be received. These cases are no authority for the proposition that the type of rights transferred *190 in the instant case are amortizable, since the renewal rights herein remained at all times the property of Farmers. The situation in the instant case more closely resembles that in Millard H. Hall, 50 T.C. 186 (1968), affd. 406 F. 2d 706 (C.A. 5, 1969). There, the taxpayer, Millard H. Hall (hereinafter sometimes referred to as Hall), purchased a contract to manage a Texas mutual assessment insurance company. The management contract stated (50 T.C. at 188): (1) It is hereby agreed by and between all parties hereto that the said D.E. Tabor shall be the sole managing head and director of all the affairs of the Bankers Life & Loan Company for a period of years equal to the life of the Charter of the said Bankers Life & Loan Company. That the compensation for the said management of the said Company shall be all monies directed to the Expense Fund under the laws and regulations of the Department of Insurance of Texas. (2) It is further agreed that out of the said monies so collected by said Company and turned over to the said D. E. Tabor as his compensation, that the said D. E. Tabor is to pay all operating expenses of the said Company, such *191 as office rent, typists, stenographers, printing material, telephones, telephone bills and all other incidental bills and expenses in connection with said Company. Under Texas law, the manager could employ general agents for the sale of insurance; he also controlled all company policies, expenditures and operations. The expense fund mentioned in the above contract consisted of a specific percent of each year's premium income. What remained in the expense fund after all expenses necessary for the conduct of the business were paid therefrom, constituted profit for the manager. Once the manager ceased to conduct the business, all rights to any receipts terminated. We denied Hall any amortization deduction and in so doing stated (50 T.C. at 196-198); In the instant case, the rights petitioner obtained upon the assignment to him by Tabor of the management contract with Bankers Life were not rights to "insurance renewal commissions." * * * Since what petitioner purchased was not renewal commissions, there is no basis in the record for amortizing the payment he made to Tabor for the management contract on any estimated period of time that premium income which was on the *192 books at the date the management 741 contract was assigned to petitioner might be expected to remain on the books. We went on to state that if the provision in the contract designating the term of management to be for the life of the charter was unenforceable under Texas law (50 T.C. at 199); it follows that petitioner acquired the rights of manager under this contract for as long as he or any assignee of his performed satisfactorily the management services of the company so as to have the members or board of directors of the company renew the contract. Viewed in this manner the contract takes on many of the aspects of a license which is renewable on a yearly basis. Such licenses have been held to have no reasonably ascertainable useful life. In Morris Nachman, 12 T.C. 1204 (1949), affd. 191 F. 2d 934 (C.A. 5, 1951), we held that a payment made by the taxpayer for a retail liquor vendor's license which was for 1 year but was renewable was an asset having an indeterminate useful life beyond the taxable year in which it was purchased since the issuing authorities of the license had for a number of years followed the practice of renewing *193 the license of the previous holder. The Fifth Circuit in affirming our decision, made the salient point (406 F. 2d at 709-710): The distinction between the asset acquired by Mr. Hall and the acquisition of a mere right to receive commissions already earned lies in the fact that he could run this company, sell as much additional insurance as he could place and be entitled to a large proportion of * * * each year's annual premiums both on old policies and on newly placed policies received by the company during its life. * * * We conclude that the Tax Court had no course other than to hold, as it did, that a management contract that gave an indefinite right to the purchaser to operate the company in a manner that would produce income for an indefinite period in the future, and which actually had a value, according to his estimation, eight years after his acquisition, substantially higher than the price he had paid for it was not subject to amortization or depreciation under the provisions of Section 167 IRC, 1954, and Section 1.167(a)(3) Income Tax Regulations. * * * We think that the above rationale is squarely applicable *194 to the instant case. Petitioner did not purchase the right to renewal commissions. Rather, he acquired the opportunity to be appointed to the position of district manager when Swofford ended his position with Farmers. As district manager, Marte would have the opportunity (the same as Hall) to generate future business to replace policies which lapsed and to cncrease the number of policies, from which he would obtain service commissions. As Marte stated at trial, he, in part, paid for - the right to try to develop and make it a larger district off of Farmers Insurance where I can get commissions on that too. Marte subsequently admitted at trial that Farmers expected him not only to generate business to replace policies which lapsed but also to increase the number of policies in the district. Further, Marte stated that "his main job was to recruit and train new men with the idea of trying to develop the area." To be sure, Marte did receive, immediately upon becoming manager, commissions based on policies then in existence but Hall likewise received commissions based on policies in existence at the time he entered his agreement. This fact was deemed unimportant by the Fifth Circuit *195 and ourselves in Hall, supra. Similarly, this is the case here since in any event Marte also was able to generate business to replace lapsed policies and to increase future business by virtue of his appointment as manager. Whether or not Marte would be able to replace policies and generate new business is purely conjectural. He admitted at trial, however, that at such time in the future as he terminated his relationship with Farmers, he hoped to sell his management contract to them for more than he had paid Swofford. In short, he expected that the value of his rights purchased from Swofford would not diminish over his term as manager, in effect, thereby admitting that he believed that the asset was not a wasting asset, a prerequisite for any amortization deduction under section 167. Detroit Edison Co. v. Commissioner, supra. At any rate, the fact remains that losses by lapse of policies in effect at the time of purchase may be offset in a continuing manner by new policies generated in the course of the business, and under the appointment agreement which Marte obtained by virtue of his contract with Swofford, he was to receive a commission based on the *196 income generated by all policies. The time over which income will be generated from his rights as appointee of Farmers, whether those rights diminish or not, is coexistent with the term of Farmers' 742 appointment agreement. That agreement is terminable at the will of either party and petitioners introduced no evidence to show that there was a set time after which Farmers normally would terminate. In all probability, insofar as Farmers is concerned, the agreement will remain in effect as long as Marte performs his duties satisfactorily, a period of time which is unknown. Thus, we can ascertain no reasonable life span over which his rights may be amortized as required by section 1.167(a)-3, Income Tax Regs.
At trial, petitioners introduced evidence as to the percentage of policies in Marte's district which lapsed over a six-month period of time. They concluded from this evidence that an ascertainable useful life for Marte's rights had been established on this basis. These percentages, however, were based on the number of policies existing at the beginning of each six-month period, which policies included any new policies entered into in the prior period. *197 The statistics do not show what percentage of policies in effect at a particular time fail to be renewed or terminate each period. (They certainly do not show the expected life span of commissions to be generated by future policies.) Even assuming that Marte received rights to renewals, we cannot determine from the statistics a definite life span for them. [4] Nor, assuming he did acquire such rights to renewals, have petitioners introduced sufficient evidence to value them separately (for purposes of amortizing them) from Marte's opportunity, by virtue of the appointment agreement, to obtain commissions on future policies, the duration of which is certainly unknown. Compare First Pennsylvania Banking and Trust Company, 56 T.C. - (June 30, 1971); Western Mortgage Corporation v. United States, 308 F. Supp. 333, 337 (C.D.Cal. 1969); Securities-Intermountain, Inc. v. United States, an unreported case ( D. Ore. 1970, 25 A.F.T.R. 2d 70-795, 70-1 USTC 9268). *198 We find and hold, in light of the nature of the rights here obtained, that petitioners are not entitled to amortize the price paid for Swofford's management rights. Decision will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
*. Farmers refers to Farmers Insurance Exchange, Truck Insurance Exchange and Fire Insurance Exchange. ↩
**. Lapse ratios for Mid-Century Insurance Company were not maintained until 1968.↩
2. SEC. 167. DEPRECIATION. (a) General Rule. - There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) - (1) of property used in the trade or business, or (2) of property held for the production of income.↩
3. Sec. 1.167(a)-3. Intangibles. If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill. For rules with respect to organizational expenditures, see section 248 and the regulations thereunder. For rules with respect to trademark and trade name expenditures, see section 177 and the regulations thereunder.↩
4. Likewise, these statistics offer no basis from which we can ascertain a useful life for any right of access to the use of business records and policy files of the district which Marte may have obtained by virtue of the agreement.↩