**Marte A. FORMICO and Eula J. Formico, Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

**No. 71-2882.**

United States Court of Appeals, Ninth Circuit.

Jan. 30, 1974.

Herman P. Scampini, Jr. (Argued), of Janin, Morgan & Brenner, San Francisco, Cal., for appellants.

K. Martin Worthy, Chief Counsel, I. R. S., Washington, D. C., Scott P. Crampton, Asst. Atty. Gen., Tax Div., Jane M. Edmisten (Argued), U. S. Dept. of Justice, Washington, D. C., for appellee.

Before MERRILL, KOELSCH, and SNEED, Circuit Judges.

OPINION

SNEED, Circuit Judge:

This appeal involves. a disputed deficiency in the income taxes paid by Eula and Marte Formico ("Taxpayer")[1] for the calendar years 1966 and 1967 in the amounts of $3,836.33 and $3,977.75 respectively. At issue here is whether the Tax Court erred in finding that Taxpayer had purchased solely "management rights" in connection with his acquisition of an insurance business, and that

1. Eula J. Formico was made a party to this action solely because she filed joint income tax returns with her husband, Marte A. Formico, for the years at issue here. For purposes of this opinion, only the latter is referred to as "Taxpayer" herein.

such rights were an intangible asset not subject to depreciation under Section 167(a) of the Internal Revenue Code of 1954, 26 U.S.C. § 167(a).

In 1957, Grover M. Swofford was appointed a district manager for Farmers Insurance Exchange, Truck Insurance Exchange, Fire Insurance Exchange, Mid-Century Insurance Company and Farmers New World Life Insurance Company (collectively "Farmers"). By virtue of his appointment agreement, Swofford was given access to, and use of, the business records and policy files relating to his district. In addition to providing that he was entitled to receive and collect commissions on all policies generated in his district and written by Farmers, the agreement also provided that Swofford would receive a commission on the renewal of any policies which had been produced by him. In the event of cancellation or other termination of their relationship, Farmers agreed to give first consideration to Swofford's nomination of a successor. It was also agreed that Swofford could negotiate with his nominee for "reasonable compensation for the value of such nomination and such goodwill as may attach to the agencies." Under the agreement, "reasonable compensation" was to be determined in accordance with a formula which established a maximum limit, subject to waiver by Farmers, at a set multiple of commissions which had been paid by Farmers to Swofford over the six month, twelve month, or two quarterly periods preceding the termination of the agreement. However, the Agreement also expressly stipulated that:

. . . all renewals and expirations, as well as any and all rights or privileges for the continuing effectiveness of all policies produced on behalf of [Farmers] including all records pertaining thereto, are and shall at all times remain the property of [Farmers]. . . .

In April of 1965, Taxpayer purchased all right, title and interest in Swofford's business as district manager for Farmers.[2] He also contemporaneously executed a District Manager's Appointment Agreement which, for present purposes, was essentially identical to that which Farmers had obtained from Swofford. Under the terms of the agreement of sale, Taxpayer agreed to purchase Swofford's ". . . insurance business as insurance agent and as District Manager for [Farmers] . . . including the goodwill of said business but not including renewals and expirations which are and remain the property of the associations and companies." In an addendum to the agreement, however, the parties expressly contracted that "[a]ll folios payable after the effective date of this Agreement shall be paid to [Taxpayer]."[3]

As a part of its normal business records, Farmers computes "lapse ra-

2. Taxpayer paid a total purchase price of $129,440.25, which consisted of $4,700 for Swofford's furniture and fixtures, and $124,740.25 as "reasonable compensation" for Swofford's nomination of Taxpayer as district manager. Swofford had received service commissions from Farmers in the amount of $24,948.05 for the six-month period preceding the date of sale; the "reasonable compensation" element of the total purchase price being derived by multiplying this figure by five pursuant to the formula in Swofford's District Manager's Appointment Agreement.

3. Prior to purchasing Swofford's rights, Taxpayer had been employed by the latter for two years on a salary basis. His responsibilities had been to promote business in the district, and he was also involved in recruiting, training and supervising local agents. When Taxpayer became manager, the policy structure of the district consisted of six-month and one year automobile and commercial truck insurance policies. All policies in the district were automatically renewable, unless cancelled, and all renewal and billing notices were sent out by Farmers. The district manager did not write or service policies in the district, nor did he handle policyholder claims. In addition to representing and promoting Farmers in the district, his function was primarily one of recruiting, appointing and training local agents, who operated as independent contractors in the sale and service of Farmers' policies.

tios", which reflect the percentage of policies in existence at the beginning of a measuring period (usually six months) that are no longer in effect at the end of the period due to nonpayment of premiums. These ratios do not take into consideration any lapses which result from legal cancellations, from policy holders dying or moving to another district, from underwriting cancellations or from the sale of insured property. Nor do the ratios take into consideration new policies added during the period, such policies being reflected in subsequent measuring periods. Farmers does, however, keep other records which indicate the percentage loss over each measuring period due to cancellations or other terminations of existing policies.

In his joint income tax return for the years 1966 and 1967, Taxpayer and his wife claimed an annual amortization deduction of $12,367 with respect to the rights which he had acquired pursuant to the agreement of sale he had executed with Swofford. The Commissioner denied this deduction on the ground that Taxpayer had purchased intangible contract rights, equivalent to goodwill, having an indeterminate useful life. The Tax Court[4] upheld the Commissioner on the ground that the assets acquired by Taxpayer did not meet the requirements for amortization under the Code and applicable regulations. 26 U.S.C. § 167 (a); T.R. 1.167(a)–3. The basis for the Tax Court's opinion was that Swofford could not have transferred rights to renewal commissions because under his district manager's appointment agreement these rights had remained at all times the property of Farmers. Rather, Taxpayer was held to have acquired the opportunity to be appointed district manager of an ongoing insurance business when Swofford ceased to hold that position with Farmers. Given that Taxpayer's appointment was of indefinite duration, and that he fully expected to sell his management contract at such time in the future as he terminated his relationship with Farmers for more than he had paid Swofford, the Tax Court determined that Taxpayer had failed to establish either that the rights he had acquired constituted a wasting asset or that the asset had a determinable life span over which it could be amortized.

■■ Section 167(a) of the Internal Revenue Code, 26 U.S.C. § 167(a), permits as a deduction a reasonable allowance for the exhaustion, wear and tear, or obsolescence of property used by the taxpayer for the production of income in a trade or business.[5] This provision is designed to enable a taxpayer to recover the cost of a wasting asset used in his business by allowing a deduction that reflects the diminution in value of the asset as it is used. See Detroit Edison Co. v. C. I. R., 319 U.S. 98, 101, 63 S.Ct. 902, 87 L.Ed. 1286 (1943). While the Code does not speak directly to allowing a depreciation deduction with respect to intangible assets, the applicable Treasury Regulation permits an intangible asset to be depreciated provided the taxpayer can demonstrate that its useful life can be estimated with reasonable accuracy.[6]

4. ¶ 71,171 P—H Memo T.C. (1971).
5. Section 167 reads in pertinent part:
   (a) *General Rule.*—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—
   (1) of property used in the trade or business, or
   (2) of property held for the production of income.
6. Treasury Regulation 1.167(a)–3 provides that:
   *Intangibles.*—If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill. . . .

Thus in order to prevail, Taxpayer must establish that the rights he acquired when he purchased Swofford's business constitute a wasting asset having a useful life capable of being estimated with reasonable accuracy. Commissioner of Internal Revenue v. Seaboard Finance Co., 367 F.2d 646 (9th Cir., 1966); Hoffman v. C. I. R., 48 T.C. 176 (1967).

Taxpayer contends that the only right which he acquired was the right to receive renewal commissions on those policies in his district which existed at the time of his appointment; that this right has a definitely ascertainable useful life which does not exceed ten years; and that therefore a depreciation allowance is proper under section 167(a), 26 U.S.C. § 167(a). However, under both Swofford's and Taxpayer's agreement with Farmers, all renewals were and at all times remained the property of Farmers. Taxpayer could not have purchased that which Swofford did not own, and the mere fact that the purchase price under their agreement was determined according to a multiple of the service commissions actually received by Swofford as a result of policies in effect for the six-month period preceding the purchase does not imply anything to the contrary. *See* Roy W. Johnson, 53 T.C. 414, 425 (1969).

Given that the right to renewal commissions remained at all times in Farmers, such cases as H. B. Hill, 3 B.T.A. 761 (1926); Lewis N. Cotlow, 22 T.C. 1019 (1954), aff'd 228 F.2d 186 (2d Cir., 1955); and Francis E. Latendresse, 26 T.C. 318 (1956), aff'd 243 F.2d 577 (7th Cir., 1957), which have been cited by Taxpayer, are inapposite. They involve an assignment by life insurance agents of their rights to receive, over a definite period of time, a percentage of the renewal premiums paid by existing policyholders—at issue being the manner in which the total purchase price would be amortized over the known period during which such commissions would be received.

In the instant case, Taxpayer's position appears most nearly analogous to that before the court in Millard H. Hall, 50 T.C. 186 (1968), aff'd 406 F.2d 706 (5th Cir., 1969). In *Hall*, the taxpayer had purchased a contract to manage a Texas mutual assessment insurance company. In holding that Hall had purchased non-amortizable "management rights", as opposed to the mere right to receive renewal commissions, the Fifth Circuit said that:

> [T]he management contract purchased by Mr. Hall was something entirely different [than the purchase of renewal premium commissions.] He, of course, would benefit from the keeping on the books of the company all of the policies that were there at the time of the purchase, to the extent of his ability to do so. But this, of course, is not what he bought at all. He would benefit equally by every dollar of premium income he could generate by selling new policies.

> \*    \*    \*    \*    \*    \*

> This distinction between the asset acquired by Mr. Hall and the acquisition of a mere right to receive commissions already earned lies in the fact that he could run his company, sell as much additional insurance as he could place and be entitled to a large portion of . . . each year's annual premiums both on old policies and on newly placed policies received by the company during its life.

> \*    \*    \*    \*    \*    \*

We conclude that the Tax Court had no course other than to hold, as it did, that a management contract that gave an indefinite right to the purchaser to operate the company in a manner that

Treasury Regulations which have been in effect over an extended period of time are deemed to have received congressional approval and have the effect of law. Helvering v. Winmill, 305 U.S. 79, 83, 59 S.Ct. 45, 83 L.Ed. 52 (1938). As this regulation has remained in effect in substantially the same form since 1918, it would appear to fit well within this classification.

would produce income for an indefinite period in the future, and which actually had a value, according to his estimation, eight years after his acquisition, substantially higher than the price he had paid for it was not subject to amortization or depreciation under the provisions of Section 167 IRC, and Section 1.167(a)(3) Income Tax Regulations. 406 F.2d at 709–710.

As found by the court below, Taxpayer purchased the opportunity to be appointed district manager when Swofford terminated his relationship with Farmers. As such, he would have the opportunity to generate future business, thereby both replacing lapsed policies and increasing the overall number of policies from which he could obtain service commissions. Like Hall, he was entitled to receive renewal commissions on existing policies immediately upon his appointment and fully expected that he would be able to resell his management contract at a higher price than he had paid for it. Thus not only has Taxpayer failed to establish that he purchased a wasting asset, which is a prerequisite for any depreciation allowance under section 167(a), Detroit Edison Co. v. C. I. R., *supra*, but, as noted by the Tax Court,

> The time over which income will be generated from his rights as appointee of Farmers, whether those rights diminish or not, is coexistent with the term of Farmers' appointment agreement. That agreement is terminable at the will of either party and petitioners introduced no evidence to show that there was a set time after which

Farmers normally would terminate. In all probability, insofar as Farmers is concerned, the agreement will remain in effect as long as [Taxpayer] performs his duties satisfactorily, a period of time which is unknown. Thus we can ascertain no reasonable life span over which his rights may be amortized as required by Section 1.-167(a)–3, Income Tax Regs. ¶ 71,171 P–H Memo T.C. at 776.[7]

Nor do we feel that the lapse ratios introduced at trial have established with the requisite accuracy an ascertainable useful life for the rights which Taxpayer acquired. The percentages reflected in Taxpayer's lapse rates are based on the number of policies in existence at the beginning of each six month period. Not only do they fail to show what percentage of policies in effect at any given time fail to be renewed in each period, but they also fail to take into account that the rate of loss of renewals may be keyed to external factors such as competition and quality of service rendered with respect to those policies. Even assuming that Taxpayer had acquired both the right to renewal commissions and the right to manage an ongoing insurance business, an issue which we need not reach here, the lapse ratios are insufficient to allow separate valuation for purposes of amortization. Compare First Pennsylvania Banking & Trust Co., 56 T.C. 677 (1971); Western Mortgage Corp. v. United States, 308 F.Supp. 333, 337 (C.D.Cal.1969); Securities-Intermountain, Inc. v. United States (unreported), (D.Or.; 1970, 25 A.F.T. R.2d 70–795, 70–1 U.S.T.C. ¶9268).

We affirm.

---

7. The situation here also appears analogous to that before the Fifth Circuit in Nachman v. C. I. R., 191 F.2d 934, 936 (5th Cir., 1951), where the court denied amortization of a liquor license which was renewable annually. This renewal privilege being of indefinite duration, dependent upon petitioners' wishes as well as upon the City's future course of action, there is no rational basis for prediction as to duration.
*See also*, Richmond Television Corp. v. United States, 354 F.2d 410 (4th Cir., 1965); Commissioner of Internal Revenue v. Indiana Broadcasting Corp., 350 F.2d 580 (7th Cir., 1965), cert. denied 382 U.S. 1027, 86 S.Ct. 645, 15 L.Ed.2d 539 (1966).