NARRAGANSETT WIRE CO., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Narragansett Wire Co. v. Commissioner
Docket No. 5645-71
United States Tax Court
T.C. Memo 1973-135; 1973 Tax Ct. Memo LEXIS 150; 32 T.C.M. (CCH) 643; T.C.M. (RIA) 73135; June 25, 1973, Filed Allan P. Cusick, for the petitioner. William T. Hayes, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioner's Federal income tax for its taxable year 1966 in the amount of $46,213.61. Petitioner in its petition claims an overpayment of its Federal income tax for its taxable year in the amount of $24,408.36. The issues for decision are: 1. Whether the statute of limitations barred any assessment of income tax for the year 1966 at the time the notice of deficiency was issued even though the notice was sent within the period of a timely 2 agreement executed by petitioner's president and an authorized representative of respondent, extending the period of limitations for assessment of tax to June 30, 1971, because (a) the agreement was obtained from the taxpayer's president rather than from the taxpayer's duly authorized, enrolled agent; (b) the agent presenting the agreement to petitioner's representative informed the representative that absent the extension a claimed deduction would be disallowed; and (c) the agreement was executed *153 after the original examination of petitioner's books and records had been concluded. 2. Whether the expenses of the receiver of petitioner's affiliate, Transarizona, an accrual basis taxpayer, were ordinary and necessary business expenses of Transarizona properly accrued during the period of affiliation. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner, Narragansett Wire Co., Inc. (Narragansett) is a corporation which was organized under the laws of the State of Rhode Island in 1946. Its principal business activity is the drawing, insulating, and sale of copper wire. At the time of the filing of the petition in this case, Narragansett's principal office was in Pawtucket, Rhode Island. Narragansett kept its books of account and filed its income tax returns in accordance with an accrual method of accounting, and for taxable years ended on December 31. Narragansett filed a Federal income tax return for its taxable year 1966 with the district director of internal revenue at Providence, Rhode Island. 3 Narragansett and Transarizona Resources, Inc. (Transarizona) were qualified to file a consolidated income tax return for *154 the period July 1, 1966, to December 31, 1966, and did file a consolidated return for that period. [1]
Transarizona was a corporation organized under the laws of the State of Arizona in 1956. Its principal business activity was mining, primarily copper mining. Its principal offices were located in Vancouver, British Columbia, Canada. During the period between January 1, 1962, through December 31, 1965, Transcontinental Resources, Ltd. (Transcontinental), a corporation with its principal offices in Vancouver, British Columbia, owned 78.2 percent of the stock of Transarizona. Prior to October 4, 1962, Southern Arizona Bank & Trust Co. (hereinafter Referred to as Bank) loaned approximately $450,000 to Transarizona which was secured by various chattel and real property mortgages. Ninety percent of Bank's loan to Transarizona, or about $405,000 was guaranteed by United States Small Business Administration (SBA). Bank had the responsibility of servicing the loan. By the fall of 1962, Transarizona had defaulted on the loan. Officials of Bank contacted an experienced mining engineer, Sherwood *155 B. Owens (Owens), and requested that he serve as receiver 4 of Transarizona if Bank was successful in having Transarizona placed in receivership. Owens agreed to serve as receiver and on October 4, 1962, Bank initiated a foreclosure proceeding against Transarizona. On October 15, 1962, Owens was appointed receiver pendente lite of Transarizona by the Superior Court of Arizona in and for Pinal County. The receiver was instructed by the Superior Court to negotiate and attempt the reactivation of Transarizona for the benefit of the secured creditors, the unsecured creditors, and the stockholder. Owens was under the distinct impression that his main concern was to protect the position of Bank and SBA. At the time of Owens' appointment as receiver, Transarizona's assets consisted chiefly of a segregation process recovery plant and numerous mining leases. Many of these leases required a payment of a minimum amount per month to keep the lease in effect. Transarizona was not an operating copper mining company at the time it was placed in receivership, and there were little or no revenues coming into Transarizona from which to meet these recurring expenses. Owens requested Transcontinental, *156 the controlling stockholders of Transarizona, to furnish funds to meet these expenses. Transcontinental refused to furnish any funds whatsoever. Owens submitted a receiver's interim report to the Superior Court on February 6, 1963, together with a petition for fees and costs. This report stated in part as follows: b. Machinery Equipment and Plant: Transarizona owns a large mining facility for processing and milling. This equipment is designed to use a new and as yet commercially 5 unproven recovery process, despite the fact that small-scale test operations have yielded optimistic results. Because of the highly specialized character of the equipment it is the receiver's opinion that the equipment would bring only a fraction of its actual value if sold at public or piece-meal sale as opposed to being sold as an operating unit. Any recovery for the benefit of unsecured creditors depends entirely on the receiver being able to hold the total company assets as a unit and disposing of them in that manner. * * * * * * 5. Negotiations and Operating Capital. The Southern Arizona Bank and Trust Company, and S.B.A. have been extremely cooperative and have advanced, at the *157 receiver's request, funds with which to protect and preserve the assets of the corporation, and have expressed willingness to cooperate with the receiver in his attempts to secure a responsible operator and/or purchaser for the entire properties. The receiver considers the following three requirements as basic in securing an operator and/or purchaser: (a) A new operator or purchaser must have ample capital with which to conduct the operation. (b) The operator and/or purchaser must be acceptable to the Southern Arizona Bank and Trust Company and the S.B.A., otherwise the loan of over $400,000.00, secured by all company assets, could not be refinanced. (c) The new operator and/or purchaser must be prepared to negotiate with unsecured creditors and make satisfactory arrangements with them to recover a substantial portion of their indebtedness. With these requirements, receiver has found it necessary to carry on continuing negotiations with the creditors, stockholders and prospective operators and/or purchasers, and in the course of the negotiations has been required to travel to Hendersen, Nevada, for conferences with representatives of Stouffer Chemical and with Thiokol Corp. and *158 to Farmington, New Mexico, for conferences with Larico, Inc., and to Phoenix, Arizona, and to Casa Grande, Arizona, on many occasions for continuing conferences with creditors, engineers and representatives of Hecla Mining Co., Day Mines, Inc., American Exploration Co., and Orchan Mining Co. Receiver also engaged in many conferences with these people in Tucson and is able to report success in creating a genuine interest and a possible takeover of the project. * * * 6 9. Receiver submits as his Exhibit A, attached hereto and made a part hereof for all purposes, his itemized expenses through January 31, 1963, and respectfully requests the Honorable Court issue an Order approving said expenses. 10. Receiver submits his Exhibit B, attached hereto and made a part hereof for all purposes, representing sums expended by the Southern Arizona Bank for the purpose of preserving the assets as hereinabove described, both mining claims and personal property. Receiver respectfully requests an order of the Court approving said sums advanced to preserve assets as proper expenses of receivership. 11. Receiver, by this reference to the entire report submitted herewith, respectfully *159 petitions the Court for an order approving a monthly receiver's fee in the sum of $1,000. Receiver petitions for said amount as an interim figure pending possible sale of the entire plant and ore bodies which would provide a basis for a percentage fee contingent upon the amount of the sale. Petitioner requests an Order of the Court approving the said monthly sum pending further developments. 12.Petitioner has found it necessary, and has used the services of attorney Myles C. Stewart, from and after December 1, 1962, through the present date, and requests an Order of this Court fixing the remuneration of said attorney at the sum of $300.00 per month through the date of this report and the sum of $250.00 per month as an advance against time from and after the date of the report, said time being valued at $25.00 per hour, and to be included at that rate above the basis retainer figure of $250.00 per month. The Superior Court by order dated February 8, 1963, approved the receiver's report and recognized that sums totaling $12,219.64 "are hereby approved as proper expenses of administration and are recognized as having been advanced by the Southern Arizona Bank and Trust Company, *160 Tucson, Arizona, in order to preserve the assets." The Court also approved the $1,000 per month fee for the receiver and fees for the receiver's attorney at the rate of $300 per month through January 1963 and at the rate of $25 per hour with an advance of $250 per month thereafter as requested in the report. 7 Between October 15, 1962, the date on which Owens was appointed receiver of Transarizona and December 31, 1962, Owens incurred expenses in the amount of $844.14 as receiver and for the month of January 1963 the amount of $289.87 for a total of $1,134.01, these expenses being in general for meals, lodging, and travel expenses. The Superior Court order of February 8, 1963, also approved these expenses as a proper expense of the receivership. Owens was reimbursed for these expenses in February 1963 by a check from Bank. During the month of February 1963, Bank issued checks totaling $8,299.47 which included payments to Owens for his expenses as receiver from October 15, 1962, through January 31, 1963, and his receiver's fee earned through February 1963. After February 1963 the representatives of SBA informed Owens that they had concluded that Transarizona could not *161 repay the loan to Bank which SBA had guaranteed and consequently, SBA would not participate in sharing any expenses with respect to Transarizona which were not absolutely vital to the preservation of the property itself, including receivership salaries and consultants' fees. At this time Bank entered into an informal understanding with Owens to the effect that if Owens would continue to serve as receiver and continue his attempts to make Transarizona a marketable property and to find a buyer, Bank would continue to advance limited amounts of money to pay for certain recurring expenses such as a watchman's salary and monthly lease payments. Bank would not continue to advance funds to pay Owens' $1,000 per month receiver's fee nor his expenses in connection with the hoped-for 8 sale of Transarizona.Owens was assured by Bank that if he was successful in selling Transarizona, Owens would be fully reimbursed from the proceeds of the sale. Until he was reimbursed, Owens had to personally carry some of the costs of the receivership. Following February 1963, Bank continued to issue checks in payment of certain costs incurred in the operation or preservation of the Transarizona property. *162 These costs were, at various times, approved by the Superior Court as a proper expense of receivership, the amounts having been advanced the receiver by Bank in order to preserve the assets. The following schedule shows the amounts so expended by Bank and the dates the amounts were approved by orders of the Superior Court. March-July 1963
$11,864.49
August 5, 1963 [1]
August-October 1963
9,930.16
October 25, 1963
November-December 1963
3,441.41
January 8, 1964
January-April 1964
5,038.05
May 20, 1964
May-August 5, 1964
14,297.31
February 1, 1965
January-March 1965
3,958.57
May 21, 1965
April-November 1965
35,120.03
November 7, 1965
Included in the above amounts were checks drawn payable to Owens in the amounts of $5,800, $1,900, and $5,200 which were to reimburse Owens for certain special costs he incurred in connection with exploration and assessment of leased mining properties. During the same period neither Owens nor his attorney received any other funds from Bank in connection with the receivership of Transarizona. The *163 only revenues generated by operations at Transarizona during this period were $8,000.83 received in 1964. 9 In accordance with Owens' "understanding" with Bank with respect to expenses incurred by Owens as receiver of Transarizona, Owens continued to incur expenses for which he was not reimbursed by Bank. Owens separated these expenses into two categories: (I) amounts spent in connection with the preservation and protection of Transarizona's property (mostly inspection trips to the various mine sites) and conferences at which representatives of Bank or SBA participated and (II) amounts spent or expenses incurred relating to attempts by Owens to find a buyer of the Transarizona property. The following schedule shows those expenses incurred by Owens in each of the two categories for the years 1962 through 1966: Year
I
II
Total 1962
$ 844.14
$ 6,915.23
$ 7,759.37
1963
3,146.04
8,757.33
11,903.37
1964
2,551.23
6,354.16
8,905.39
1965
5,263.77
7,797.25
13,061.02
1966
1,184.69
4,668.83
5,853.52
Total
$12,989.87
$34,492.80
$47,482.67
Because of difficulties in obtaining the cooperation of the shareholders of Transarizona in any *164 proposed sale of the company, Owens recommended to Bank that the interest in or "position" of Bank be sold. On January 21, 1966, an agreement was secured with Narragansett which provided that in consideration of the sum of $729,343.57 paid by Narragansett to Bank, Bank would endorse, without recourse, the promissory note in the sum of $400,000 dated August 28, 1961, wherein Bank is payee and assign, without recourse, the mortgage on real property of Transarizona and chattel mortgages on personal property of that company. 10 This agreement further provided in part: 5. Narragansett Wire Co. in consideration of the above hereby covenants and agrees that it will indemnify and hold harmless Southern Arizona Bank & Trust Company from any and all costs, attorneys fees, and other expenses incurred in connection with said Superior Court case subsequent to the date of this Agreement, including but not limited to costs, attorneys fees, judgments by and in favor of cross-claimants, and other expenses. 6. Southern Arizona Bank & Trust Company hereby agrees that upon payment of the sum hereinabove set forth by Narragansett Wire Co., that it will release Narragansett Wire Co., its *165 successors and assigns, from all obligations due for any purpose, service, or expenses heretofore incurred in connection with all notes and mortgages described in paragraph 2. above, and all attorneys fees, receiver's fees, commissions, interests, and costs incurred by any of the signatories in Cause 6997, Superior Court of the State of Arizona, in and for the County of Pinal, as above stated. Holesapple, Conner, Jones, McFall, & Johnson, Sherwood B. Owens, and Myles C. Stewart, and each of them hereby agrees with Narragansett Wire Co. that they will look entirely to Southern Arizona Bank & Trust Company for payment of their fees, commissions, costs, and expenses as said hereinabove and will not assert any claim therewith against Narragansett Wire Co.
On January 24, 1966, Owens was paid the sum of $136,875 by Bank. With these funds, Owens paid the lawyer $23,375 for services rendered from March 1963 until January 24, 1966. Owens also paid a mining consultant the sum of $24,200 for services rendered. The remainder of the funds was retained by Owens. Following the agreement of January 24, 1966, between Owens, Bank, and Narragansett, Narragansett paid Owens, on a monthly basis, *166 the sum of $10,254.57 during the remainder of the year 1966, partly for Owens' assistance to Narragansett in acquiring the outstanding stock and debentures of Transarizona. On July 1, 1966, Narragansett acquired 100 percent of the common stock of Transarizona. 11 Following his receipt of approval of his expenses as receiver of Transarizona for the period October 15, 1962, through January 31, 1963, Owens, in each of his reports to the Superior Court except for his final report, included the following or a similarly worded paragraph: That receiver has, since his first interim report continued to preserve the assets of Transarizona Resources, Inc., as a going concern and has made extensive efforts to locate and has negotiated with many corporations and individuals in an attempt to return Transarizona Resources, Inc., to a going-concern status. That receiver has incurred certain costs and expenses which shall be submitted to the Court at a later date in connection with said negotiations and preservation of assets. The Superior Court, in orders dated August 5, 1963, October 25, 1963, January 8, 1964, May 20, 1964, August 24, 1964, February 1, 1965, May 21, 1965, and November 7, 1965, recited *167 in part the following: That Receiver may submit at a future date, a report and account of his expenditures, as Receiver, since February 1, 1963, for consideration of the court and possible approval. On October 27, 1966, Owens filed his final receiver's report with the Superior Court in which he stated in part as follows: 5. Receiver submits Exhibit A, attached hereto and made a part hereof for all purposes, representing sums expended by the Southern Arizona Bank and Trust Company and by Narragansett Wire Company [in an amount totaling $26,173.92], for the purpose of preserving the assets as represented by the inventory filed in this matter, from December 1, 1965, through November 9, 1966, which sums Receiver respectfully requests the Court to approve as proper costs and expenses of preserving the assets. * * * 12 7. That Receiver has included in all previous interim reports a request that he be allowed certain costs and expenses in connection with his many duties since October 15, 1962, and expenses and fees for his attorney, and all orders of this Court in connection with such interim reports have provided that the Receiver at a future date report such items for *168 consideration of the Court. Receiver submits herewith Exhibit B covering his activities in various parts of the United States all made with the purpose and intent of securing an operating owner with sufficient capital to restore Transarizona to a productive and vital status as a copper producer, and that in connection with the activities set forth in Exhibit B the Receiver required and did make extensive use of his attorney, Myles C. Stewart, Esq. That in addition your Receiver submits an itemized statement of personal expenses attached hereto and made a part hereof for all purposes as Exhibit C. Personal expenses incurred between October, 1962, and February, 1963, were approved by the Court in its Order dated February 8, 1963, and Exhibit C sets forth those expenses through January 1966. Subsequent to the latter date all expenses have been paid by Narragansett Wire Co., and are included and set out in Exhibit D hereinafter discussed. Exhibit C to Owens' final account and report lists in detail by date those expenses Owens incurred between February 1963 and January 1966. The expenses are of the same sort as were approved by the Superior Court in its order dated February 8, 1963. *169 The following schedule lists the yearly totals of these expenses: February-December 1963
$2,856.17
1964
2,551.23
1965
5,263.77
January 1966
230.12
Owens filed an amendment to his final receiver's report with the Superior Court on November 9, 1966. This amendment states in part as follows: 3. That by Order of this Court dated October 15, 1962, receiver was duly appointed, instructed and authorized to negotiate and enter into leases or licenses of the property within the receivership, with the approval of the Court, 13 and that this receiver from an aftersaid date and through the date of this report continued to in all respects carry out the Order of the Court including negotiations with respect to the property. That on numerous occasions receiver and his attorney made personal reports to W. C. Truman, Judge of the Superior Court of the State of Arizona, concerning the many negotiations, conversations and agreements, all made with the intent to convert the property in receivership to operating status either by lease or sale. 4. That Receiver and his attorney, officers of the Southern Arizona Bank and its attorneys, and officials of Small Business *170 Administration and its counsel, met on many occasions during the first year of the receivership. That during the initial meetings, Small Business Administration objected to any expenses and any fees which the Receiver would incur beyond those required and proper for a non-operating receivership. All parties to those conferences did, however, agree that the Receiver and his attorney could continue, at their own expense and with no guarantee of repayment, to make any and all attempts deemed worthy of the effort to conclude sales, leases, or operating agreements with respect to the receivership property, and that should such activity on the part of the Receiver result in income or sale, any expenses or proper fees secured as a result thereof would be acquiesced in and approved by Small Business Administration and the bank. The details of these conversations and agreements were fully and entirely demonstrated and explained to Judge W. C. Truman, and he approved informally. 5. In Paragraph 3 of the Receiver's Final Account and Report filed October 28, 1966, the Receiver set forth the general terms of the written agreement between Plaintiff and Narragansett Wire Co., which agreement *171 resulted in a sale of Southern Arizona Bank's position to Narragansett, and which agreement included the sum of $136,875.00 representing costs, expenses and fees of the Receiver and his attorney. That of said sum Narragansett Wire Co. has acknowledged accounting for a total of $56,353.29 and has asked the Receiver and his attorney to render a supplementary accounting for the sum of $80,521.71; and, the balance of this amended petition is in fact an accounting to demonstrate the propriety and reasonableness of the costs, expenses and fees of the entire sum rather than the $80,521.71. 14 6. That of said sum the Receiver paid to Myles C. Stewart as his attorney the sum of $23,375.00 for services rendered over a period of the receivership. Exhibit E represents an accounting and justification of the reasonableness of said sum, it representing in excess of one thousand hours of time in traveling to conferences, court appearances, office time and research, and negotiations since the beginning of this receivership, much of said time including week ends and very late evening hours because many of the prospects were from out of state and could not remain for several days of normal conference *172 periods. 7. That Exhibit F attached hereto and made a part hereof for all purposes represents an accounting of $113,500.00 obtained by the Receiver to acquit expenses, costs, fees and interest incurred by the Receiver in the period of the receivership as items direct and necessary to his duties in relationship to the Southern Arizona Bank and later to Narragansett Wire Co. The exhibit reflects many trips out of the state of Arizona and the normal and necessary expenses thereto, which eventually resulted in a sale of the assets of the receivership which will now be an operating copper mine owned and financed by responsible and eminently qualified corporations of national stature. A small portion of the total expenses and fees is represented by the Receiver's activities at the request of Narragansett Wire Co. which resulted in the accumulation of outstanding stock of Transarizona Resources, Inc., and its debentures, and the marshalling and renegotiation of mining leases and myriad other administrative details. 8. That at all times during the negotiation and execution of the contract between Southern Arizona Bank and Narragansett Wire Co. referred to in Paragraph 5 herein, it *173 was the understanding of petitioner and his attorney that the sale was a negotiated transaction for a fixed gross price. Exhibit F attached to this amendment showed the following: 15 Funds received by Sherwood B. Owens, Receiver, as applicable to expenses and/or fees on Transarizona project. Source
Year
Amount Southern Arizona Bank & Trust Co.
1962
None
Southern Arizona Bank & Trust Co.
1963
$ 5,634.01
Southern Arizona Bank & Trust Co.
1964
None
Southern Arizona Bank & Trust Co.
1965
None
Southern Arizona Bank & Trust Co.
1966
136,875.00
Narragansett Wire Co.
1966
10,254.57
TOTAL funds received from all sources by Sherwood B. Owens applicable to expenses and fees
$152,763.58
Disposition of funds received by Sherwood B. Owens, Receiver, as applicable to expenses and/or fees on Transarizona project.
Expenses incurred by Sherwood B. Owens during the period October, 1962 - November, 1966 directly chargeable to his activities on behalf of the project
$47,482.67
Consultant Fees (including consultant expenses) as paid by Sherwood B. Owens
25,700.00
Attorney Fees as paid by Sherwood B. Owens
23,375.00
Remaining to Sherwood B. Owens as Receiver's fees and as additional remuneration for special services in the securing of stock, debentures, outside interests, etc. on behalf of the project
56,205.91
TOTAL disbursement of funds
$152,763.58
*174 16 Breakdown on expense items as listed on Statement Year
Expense items listed separately as per request Southern Arizona Bank - Small Business Administration that expenditures for preservation and protection of the property and for travel and/or conferences in which they participated be so carried.
Travel and general expenses incurred by Sherwood B. Owens in carrying forward negotiations with various mining companies and groups.
TOTAL for the year 1962
$ 844.14
$ 6,915.23
$ 7,759.37
1963
3,146.04
8,757.33
11,903.37
1964
2,551.23
6,354.16
8,905.39
1965
5,263.77
7,797.25
13,061.02
1966
1,184.69
4,668.83
5,853.52
TOTALS
$12,989.87
$34,492.80
$47,482.67 Breakdown on Consultant Fees and expenses as listed on Statement Year Amount paid by Sherwood B. Owens 1962
None
THIS SCHEDULE SHOWS YEAR OF PAYMENT. OBLIGATION FOR GROSS SUM ACCRUED DURING ALL FIVE YEARS OF RECEIVERSHIP. SAME IS TRUE FOR ATTORNEY'S FEE BELOW.
1963
None
1964
$1,000.00
1965
500.00
1966
24,200.00
TOTAL
$25,700.00 Breakdown on Attorney Fees as paid and listed Year Amount paid by Sherwood B. Owens
1966
$23,375.00
TOTAL
$23,375.00
*175 17 Attached to the Amendment to Final Account and Report was a narrative statement by years of Owens' activities in connection with the receivership. For the years 1962 through 1965, the detail recited some activities in connection with preservation of the assets of the receivership but primarily activities in the attempted sale of the company, showing total hours of 85, 350, 290, and 322, respectively, for these years. For 1966 the attachment showed the following: Although the contract between Southern Arizona Bank and Narragansett was signed in late January of 1966, there was much time and many conferences between Narragansett, the Receiver and the bank preliminary thereto. Also, Receiver conferred with counsel re Bagdad Copper Corporation negotiations, conferences with attorney Hing by long distance telephone and in person with respect to the Ogden-Gruner interests; Pinal Copper Corporation leases and the legal effect thereof; Papago Indian leases, conferences with attorneys and mining representatives; Court appearances in Pinal County; many conferences with Receiver subsequent to Narragansett contract with respect to outstanding common stock and debentures of Transarizona *176 Resources, Inc., and concerning contingent remainder interests in mining leases, stock and debentures of G. A. Freeman and Dwight McClure; time involved in preparing Final Account and Report and Amendment thereto and Schedules thereto, and other miscellaneous long distance telephone calls. 95 hours On June 20, 1967, Transarizona filed its U.S. Corporation income tax returns for its calendar years 1962, 1963, 1964, 1965, and for its taxable period January 1, 1966, through June 30, 1966, with the district director of internal revenue, Phoenix, Arizona.
Transarizona claimed "Receiver's Fees & Expenses" as a deduction from its gross income for the taxable years and in the amounts as follows: 18 Year
Amount
1962
$ 3,934.01
1963
15,406.68
1964
15,000.00
1965
15,000.00
January-June 1966
7,811.22
On May 17, 1967, Narragansett filed its U.S. Corporation income tax return for its calendar year 1966 with the district director of internal revenue, Providence, Rhode Island. This return also included, on a consolidated return basis, the taxable period July 1, 1966, through December 31, 1966, of Transarizona. Narragansett claimed as a deduction from its gross *177 income on a consolidated return basis, the amount of $96,278.83 as "Receiver's Fees and Expenses" incurred by Transarizona during the period July 1, 1966, through December 31, 1966. This same return had attached as a schedule the balance sheet of Narragansett as of December 31, 1966. This balance sheet shows as an asset of Narragansett, an "Investment in Transarizona, Inc." with the amount stated to be $793,829.41. In the latter part of 1968, Revenue Agent Charles F. Bierne of the Office of the District Director of Internal Revenue, Providence, Rhode Island, began an audit of Narragansett's corporate income tax return for its taxable year 1966. During this audit, Bierne worked closely with Edna C. Whitten, the office manager of Narragansett. This audit was conducted in the offices of Narragansett. During the audit, Revenue Agent Bierne was visited by his group supervisor who was making a routine inspection of field audit operations. No 19 complaints were registered with Bierne's supervisor by any personnel at Narragansett. In December 1968, Bierne completed his audit of Narragansett's 1966 return. Narragansett did not agree to the Revenue Agent's findings, and the case *178 left the Agent in unagreed status. The case was sent to the Review Section of the District Director's Office by way of Bierne's group supervisor. On April 8, 1969, Roderick J. Mason, an enrolled agent, filed a power of attorney (form 2848) on behalf of Narragansett empowering Mason to represent Narragansett before the Internal Revenue Service with respect to Narragansett's taxable year 1966. Mason was specifically empowered to execute waivers (including offers of waivers) of restrictions on assessment or collection of deficiencies in tax. The initial audit of Narragansett's 1966 return was closed on or about May 12, 1969, when the Review Section received from Narragansett a fully executed Waiver of Restrictions on Assessments and Collection of Deficiency in Tax and Acceptance of Overassessment (form 870). The waiver form was signed by Robert J. Feldman, Narragansett's vice president. The deficiency assessed pursuant to this waiver in the amount of $187,440.90 was paid June 7, 1969. After the Review Section of the Revenue Service closed the case of Narragansett's 1966 tax return, the case was selected for still further review by the Internal Revenue Service's regional office *179 in New York City. The regional office returned the case to the office in 20 Providence, Rhode Island questioning the deductibility of receivership fees and expenses claimed by Transarizona as ordinary and necessary business expenses. In Providence the case was again assigned to Revenue Agent Bierne. On February 19, 1970, Revenue Agent Bierne visited the offices of Narragansett, having made an appointment by telephone the previous day. He conferred with Edna Whitten and left with her a form 872 which, if signed by authorized persons representing Narragansett, would extend the period of limitations for assessment of a deficiency in income tax of the company for the year 1966 to June 30, 1971. Bierne told Edna Whitten that the case had been reconsidered by a higher authority and that the receivership fees and expenses would have to be substantiated. Whitten asked what would happen if Narragansett refused to sign the form 872 and Bierne stated that the government would look at the available documentation supporting the claimed receivership expense deductions, and if the deduction could not be supported it would be disallowed and a deficiency would be determined. The president *180 of Narragansett, William Morely, was out of town when Bierne brought the form 872 to Whitten. When Morely returned, Whitten informed him of what Bierne had told her and Morely, on March 10, 1970, executed the form 872 extending the period of limitations to June 30, 1971. The waiver was received by the Internal Revenue Service on March 11, 1970, and on that date executed on behalf of respondent. Roderick J. Mason 21 was not informed that the Internal Revenue Service had requested the execution of the waiver on form 872 until after Morely executed it. On March 25, 1970, Mason protested in writing to Revenue Agent Bierne the "reopening" of the audit of Narragansett and the "reinspection" of Narragansett's books and records. On March 25, 1970, Revenue Agent Bierne replied in writing to Mason's letter in part as follows: Your reference to Sec. 3 [of Rev. Proc. 68-28, 1968-2 C.B. 912] is well taken as the Service agrees with your contention that this was a closed case. However, the Service does not agree with your contentions regarding Sec. 4. It is the position of the Service that the prior closing involved a clearly defined substantial error based on an *181 established Service position existing at the time of the previous examination, (Sec. 4.012). Mr. Mason, specifically, the error which the Service contends was made during the course of the examination, is that the claimed Receiver's Fees and Expenses of $96,278.83, as listed on the P & L of Transarizona for the period 7-1-66/12-31-66, was not sufficiently examined in depth. If such claimed amount would be found to be non-deductible, a potential additional tax liability in excess of $46,000.00 would arise. Such amount stands as "substantial" in the view of the Service. * * * Internal Revenue Code Section 7605(b) - In part you may read that "…the Secretary or his delegate, after investigation, notifies the taxpayers in writing that an additional inspection is necessary." The Service contends that such "investigation" is presently pending. If and when it does become necessary to have an additional inspection of the books of account, the Service will certainly comply with Sec. 7605(b) as regarding written notification. On January 21, 1970, the duly authorized representative of the Regional Commissioner did authorize a reopening of this case, but, *182 the decision to examine, or not to examine, has not yet been made. Presently our position is that of awaiting Narragansett Wire Co. to present information documenting 22 the proper allowance of the fore-mentioned charged expense. If such is done within a reasonable period of time a reexamination would not be necessary. This office does not agree with your conclusion that the proposed possibility of a reexamination is contrary to Revenue Procedure 68-28 nor IRC Section 7605(b). Execution of Form 872 - This office holds that the F-872, Consent Fixing Period of Limitation Upon Assessment of Income and Profits Tax, as consented and agreed by Narragansett Wire Co. and the District Director of Internal Revenue is a valid document. Such forms were delivered in hand to the office of Narragansett Wire Co. on February 19, 1970, and executed by the two parties on March 10th and March 11th, respectfully. [sic ] Such happenings were prior to the tolling of the normal statutory period. Such happenings were voluntary. On June 24, 1970, the Acting Regional Commissioner of the New York Region of Internal Revenue Service advised Narragansett in *183 writing that a further inspection of its books and records would be required. On January 14, 1971, Narragansett filed a Claim for Refund with the district director of internal revenue, Providence, Rhode Island, claiming an additional deduction of $50,850.74 for receiver's fees and expenses, making a total claimed for the year 1966 of $147,129.57 for receiver's fees and expenses. Respondent in his notice of deficiency to petitioner dated May 17, 1971, stated that "an affiliated group, as defined by section 1504(a) of the Internal Revenue Code, was created on or about July 1, 1966, when Narragansett Wire Co. acquired all of the stock of Transarizona Resources, Inc. It has also been determined that receiver's fees and expenses relating to the Transarizona Resources, Inc. receivership 23 proceeding were accruable prior to July 1, 1966, and are not deductible on the consolidated income tax return. Consequently your taxable income was increased in the amount of $96,278.83." OPINION Section 6501, I.R.C. 1954, [2] provides that the amount *184 of any tax imposed by the Code shall be assessed within 3 years after the return is filed but that the time for assessment (except for the estate tax) may be extended by agreement between the Secretary or his delegate and the taxpayer. Petitioner contends that respondent's statutory notice of deficiency was not mailed to Narragansett within 3 years of the date of filing of the 1966 income tax return and that there was no valid extension of the period for assessment. Petitioner contends that the form 872 which would extend the period of assessment of income tax for petitioner's taxable year 1966 was secured by respondent in violation of requirements of respondent's procedural regulations which forbade direct communication with a taxpayer by a revenue agent of respondent if that taxpayer has designated an attorney, certified public accountant, or enrolled agent to represent him in all dealings with the Internal Revenue Service, and in violation of rules of respondent prohibiting threats of a jeopardy assessment. Petitioner, also, contends that the waiver to extend the period of limitations is void because it was executed during an invalid reexamination of petitioner's books and records. *185 24 Respondent contends that the period of limitations for assessment of income tax for petitioner's taxable year 1966 was extended by reason of a validly executed and legally binding agreement between petitioner and the Internal Revenue Service. Respondent asserts that petitioner's president by his own free will executed the form 872 and that it was not obtained in violation of his procedural rules. Respondent further contends that any failure of the respondent to secure the extension of the period of limitations in accordance with his own administrative policies and procedures is not a basis for this Court to hold the waiver invalid. We agree with respondent that generally the fact that respondent fails to comply with his own procedural regulations in connection with the issuing or procuring of a document does not cause a document issued or procured in conformity with the statute to be invalid. These procedural rules are directive in character. Luhring v. Glotzbach, 304 F. 2d 560 (C.A. *186 4, 1962). Petitioner has not demonstrated that there has been a violation here of its constitutionally protected right to the due process of law. Cf. Efrain T. Suarez, 58 T.C. 792, 805 (1972). Petitioner's second procedural contention is that the agreement to extend the period of limitations for assessment is void because it was obtained by duress in that respondent's agent stated or implied that a jeopardy assessment would issue immediately against petitioner unless the form 872 were executed by petitioner. The evidence of record does not support this contention of petitioner. Although 25 Revenue Agent Bierne discussed the matter with petitioner's office manager rather than with petitioner's duly authorized agent, the evidence shows that Bierne told petitioner's office manager that unless the form 872 were executed, the Internal Revenue Service would be forced to evaluate the petitioner's deduction for receivership expenses on the basis of the documentary evidence then available which was, in his view, scant. Bierne also stated that if the Service found the claimed receivership fees were not substantiated, the deduction would be disallowed and a deficiency *187 determined. It is not duress on the part of the Commissioner for his agent to give a taxpayer notice that the Service is going to use the lawful means provided by statute to assess and collect a tax. Spencer K. Mulford, Sr., 25 B.T.A. 238, 241 (1932), affirmed 66 F. 2d 296 (C.A. 3, 1933), citing Burnet v. Chicago Railway Equipment Co., 282 U.S. 295 (1931). There is no evidence to support petitioner's contention that respondent's agent was threatening a jeopardy assessment under section 6861 against petitioner. Petitioner's third procedural contention is that the agreement to extend the period of limitations is void because it was obtained during an invalid reexamination of petitioner's books and record. Section 7605(b) provides: (b) Restrictions on Examination of Taxpayer. - No taxpayer shall be subjected to unnecessary examination or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless 26 the taxpayer requests otherwise or unless the Secretary or his delegate, after investigation, *188 notifies the taxpayer in writing that an additional inspection is necessary. Respondent asserts that he did not make a second examination of petitioner's books of account prior to obtaining the extension of the period of limitations. The record sustains respondent's position. Following Revenue Agent Bierne's audit in 1968 and 1969 of petitioner's 1966 tax return, persons in the New York regional office of the Internal Revenue Service determined that Bierne's failure to disallow the receivership expense as claimed on petitioner's 1966 return was a serious error. The case was returned to the local office of the Internal Revenue Service and it was apparent that in order for petitioner to have the opportunity to substantiate this claimed expense, considerably more time than that remaining under the normal 3-year period of limitations would be necessary. Therefore, Bierne proceeded to secure from petitioner an extension of the period of limitations. Nothing that transpired prior to the execution of the agreement was an "examination of a taxpayer's books of account" within the meaning of section 7605. There is no evidence that petitioner turned over any records to any revenue *189 agent during the period between the conclusion of the office audit of Narragansett on or about May 12, 1969, and the day on which petitioner's president signed the agreement to extend the period of limitations. Accordingly, we find that the consent to extend the period of limitations was not obtained in 27 violation of petitioner's right to be protected against unnecessary examination of its books of account. Cf. Millard H. Hall, 50 T.C. 186 (1968), affirmed 406 F. 2d 706 (C.A. 5, 1969). We hold that the agreement between petitioner and respondent to extend the period of limitations was validly executed on behalf of petitioner and that the respondent's notice of deficiency is timely. Petitioner's primary position as to the deductibility of receiver fees and expenses in the amount of $147,129.57 is that these fees and expenses are ordinary and necessary costs of doing business for the taxable year 1966, deductible under section 162. Respondent contends that the receivership expenses were not ordinary and necessary expenses of doing business, that the receivership expenses were, for the most part, not expenses of Transarizona, and that the expenses *190 were not incurred during the period July 1 through December 31, 1966. In connection with the last point, it should be noted that only during the period July 1, 1966, through December 31, 1966, was Transarizona an affiliate of Narragansett and therefore only expenses incurred by Transarizona during this period are deductible by the affiliated group which is the petitioner in this case. Transarizona filed a tax return for its taxable period January 1 to June 30, 1966, not as an affiliate of Narragansett but as a separate corporation. The expenses of Narragansett for the entire taxable year 1966 are, of course, deductible by the affiliated group for the year 1966. 28 Owens received $136,875 on January 24, 1966, from Bank and $10,254.57 during the remainder of 1966 from Narragansett for a total of $147,129.57. Petitioner contends that Transarizona incurred the receivership fees and expenses in issue on November 9, 1966, the day the Superior Court approved the expenses. Petitioner argues that not until this date had "all events" transpired to fix the liability. Respondent contends that the expenses were accrued not later than the day on which they were paid. Respondent argues *191 that since the amount of $136,875 was paid to Owens on January 24, 1966, under no circumstances did this amount accrue later than that date even if the expenses could be considered business expenses of Transarizona, which respondent contends they were not. As heretofore stated, any expense of Transarizona which was properly accrued by Transarizona prior to July 1, 1966, is not deductible from the consolidated income of Narragansett and Transarizona for the taxable year 1966. While it appears from our findings that many of the items included in the $147,129.57 received by Owens in 1966 would not constitute ordinary and necessary business expenses of Transarizona but rather expenses of attempting to sell Transarizona's entire operation or its stock, and it is certainly far from clear that the payment of the $136,875 by Bank was in effect an advance to Transarizona by Bank as distinguished from merely being an amount that Bank included in determining the amount of Narragansett's payment to Bank for its "position," we need not decide 29 either of these issues since we agree with respondent that if the $136,875 were an expense of Transarizona, it had accrued prior to July 1, 1966, and *192 the $10,254.57 paid by Narragansett has not been shown to be a deductible expense. Section 461(a) provides that "The amount of any deduction or credit allowed by this subtitle shall be taken for the taxable year which is the proper taxable year under the method of accounting used in computing taxable income." Petitioner is on an accrual method of accounting. Section 1.461-1(a)(2), Income Tax Regs., states: Under an accrual method of accounting, an expense is deductible for the taxable year in which all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy. * * * While no accrual shall be made in any case in which all of the events have not occurred which fix the liability, the fact that the exact amount of the liability which has been incurred cannot be determined will not prevent the accrual within the taxable year of such part thereof as can be computed with reasonable accuracy. * * * *193 This regulation is in accordance with the position taken in numerous cases. See Dixie Pine Co. v. Commissioner, 320 U.S. 516 (1944); Thriftimart, Inc., 59 T.C. 598 (1973); and Crescent Wharf & Warehouse Co., 59 T.C. 751 (1973). 30 Section 461(f)[3] provides that if a taxpayer contests a liability but nevertheless transfers money to provide for the satisfaction of the liability and continues to contest the liability, and, but for the fact that the liability is contested, a deduction would be allowed for the taxable year of the transfer, then the deduction shall be allowed for the taxable year of the transfer. Respondent relies on this provision of the statute, and reasons that if for an accrual basis taxpayer a cash payment causes the accrual of a contested expense, it follows that it must also cause an uncontested expense to accrue. *194 The record shows that the expenses and fees of Owens, whether or not they were proper and allowable expenses of Transarizona, to the extent of $136,875 were paid by Bank on January 24, 1966, pursuant to an agreement of January 21, 1966, to which Narragansett, Bank, and Owens were parties. In the January 21, 1966, agreement Owens agreed to look only to Bank for payment of any expenses he had incurred or fees due to him through January 1966 and Bank agreed to pay him for his expenses and fees for this period. Even if the "all events" test 31 referred to in the case law and the regulations would require a finding that the contingencies surrounding the allowance of any unpaid receivership expenses would not vanish before the day on which the Superior Court ordered their allowance, the facts in this case are clear that Transarizona owed nothing with respect to these expenses after January 21, 1966. After the signing of the January 21, 1966, agreement and the payment on January 24, 1966, to Owens for his expenses and fees through January 1966, there were no liabilities of Transarizona with respect to the receivership for this period to which the "all events" rule could attach. Regardless *195 of what liability Transarizona may have had prior to January 24, 1966, it had no liability for receivership expenses through January 1966 after that date since any such liability had been paid by Bank pursuant to its agreement of January 21, 1966, to make the payment. An amount that ceases to be a liability of a taxpayer on a certain date cannot as to that taxpayer be an "accrued expense" after that date. On November 9, 1966, when the Superior Court discharged the receiver and allowed the expenses, Narragansett was the sole stockholder and the principal, if not the only secured, creditor of Transarizona. There were no other parties having an interest in Transarizona. Narragansett as a party to the January 21, 1966, contract was protected by that contract as to any receivership expenses for the period prior to the end of January 1966. Therefore, court approval of any expenses for the period prior to the end of January 1966 could in no way cause any such expenses to be an obligation of either Transarizona or Narragansett. 32 On the basis of the facts in this record, we hold that those expenses for which Owens was reimbursed by Bank on January 24, 1966, were not properly *196 accruable by Transarizona within the period July 1, to December 31, 1966, and hence are not deductible from petitioner's consolidated gross income for its taxable year 1966. Following the January 21, 1966, agreement, Narragansett assumed responsibility for compensating Owens.The record shows that he received $10,254.57 during this period. Owens' testimony is that part of the payment was received for his assisting Narragansett in obtaining stock and debentures of Transarizona. The record does not show the purpose for which the other amounts were paid except whatever amount might have been paid for the preparation of the final report and amendment thereto. [4] It is clear that petitioner may not deduct as an expense the costs it incurs in acquiring property but must add those costs to the basis of the property acquired. Section 1016. Therefore, the amount of the $10,254.57 payment which was for 33 assisting Narragansett in acquiring stock and debentures represents nondeductible capital costs to Narragansett. Petitioner has failed to establish that the remainder of the money paid to Owens was for the ordinary and necessary costs of carrying on a trade or business. In the absence *197 of such proof, the respondent's determination is sustained. Polak's Frutal Works v. United States, 176 F. Supp. 521 (S.D.N.Y., 1959) affirmed 281 F. 2d 261 (C.A. 2, 1960). In view of our holding that the receivership expenses did not accrue in the period July 1 through December 31, 1966, we need not determine whether *198 the expenditures of Owens were within the scope of authorized expenditures of a receiver appointed pursuant to section 12-1241 of the Arizona Revised Statutes and thereby were expenditures of Transarizona and we need not consider petitioner's alternative contention that a large portion of the expenses in issue are deductible exploration expenditures within the meaning of section 617 and section 615. Decision will be entered for respondent. Footnotes
1. Narragansett Wire Co. was merged into El Paso Natural Gas Co. in October 1967. ↩
1. The Superior Court also approved the amount of $8,299.47 expended by Bank during the month of February 1963. ↩
2. All references are to the Internal Revenue Code of 1954, as amended. ↩
3. Sec. 461(f)↩ Contested Liabilities. - If - (1) the taxpayer contests an asserted liability, (2) the taxpayer transfers money or other property to provide for the satisfaction of the asserted liability, (3) the contest with respect to the asserted liability exists after the time of the transfer, and (4) but for the fact that the asserted liability is contested, a deduction would be allowed for the taxable year of the transfer (or for an earlier taxable year), then the deduction shall be allowed for the taxable year of the transfer. This subsection shall not apply in respect of the deduction for income, war profits, and excess profits taxes imposed by the authority of any foreign country or possession of the United States. 4. The $1,000 per month receiver's fees for the months of February through November 9, 1966, would amount to $9,300. The testimony was that the payments were on a monthly basis, and it was apparently largely these payments to which Owens was referring as being for assisting Narragansett in obtaining stock and debentures of Transarizona. The record is totally silent on what services, if any, Owens rendered to either Narragansett or Transarizona after July 1, 1966, when Narragansett had acquired all of the Transarizona stock. The only activity of Owens which might have been conducted during the period, as this record shows, was preparation of his final and amendment to final receiver's report. Also the record is silent as to the nature of the services or expenses for which the little less than $1,000 balance of the $10,254.57 was paid. ↩